**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Enrique ALVAREZ–GONZALEZ,
Defendant-Appellant.**

No. 75–3537.

United States Court of Appeals,
Fifth Circuit.

Oct. 25, 1977.

Nelson R. Sharpe, Jr., Kingsville, Tex., Leo Villarreal, Kingsville, Tex., for defendant-appellant.

James R. Gough, Jr., U. S. Atty., Mary L. Sinderson, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and GEE, Circuit Judges.

GEE, Circuit Judge:

The affirmance or reversal of appellant's conviction depends on whether a limited search conducted at the La Gloria, Texas, Border Patrol Checkpoint in 1974 was valid. Drugs were discovered in the course of the search for illegal aliens, but since the search was concededly carried out without benefit of either warrant or probable cause, this evidence must be suppressed unless the checkpoint is a functional equivalent of the border. If it is, such justifications are not required for routine searches conducted there of automobile trunks and other large spaces in which aliens may be concealed.

In an earlier opinion in this case,[1] we reviewed some of the authority concerning functional equivalency handed down since the Supreme Court noted, in *Almeida-Sanchez*, that "[border] searches . . . may in certain circumstances take place not only at the border itself, but at its functional equivalents as well. For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches." 413 U.S. 266, at 272–3, 93 S.Ct. 2535, at 2539, 37 L.Ed.2d 596. And on a consideration of our opinion in *United States v. Hart*,[2] we isolated three major considerations in determining functional equivalence of an interior checkpoint to the border: relative permanence of the checkpoint; relatively minimal interdiction by it of domestic traffic; and the checkpoint's capability to monitor portions of interna-

1. *United States v. Alvarez-Gonzalez*, 542 F.2d 226 (5th Cir. 1976).

2. 506 F.2d 887, *vacated and remanded*, 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 *reaff'd* 525 F.2d 1199 (5th Cir. 1976) (on remand).

tional traffic not otherwise controllable.[3] Believing that further findings of fact by the district court, findings which focused on these considerations, were needful to an evaluation by us of its ultimate determination that La Gloria was the border's functional equivalent, we remanded to the district court for such findings. In so doing, we expressly authorized the experienced trial judge to consider and make findings upon any other matters he deemed appropriate to the inquiry. Having done so, he has again concluded that the La Gloria checkpoint is the functional equivalent of the border for immigration purposes. After examining the evidence and the district court's findings, we agree.

■■■ The first major issue we asked the district court to examine concerned the character of the checkpoint: "that it functions like a permanent border checkpoint and not like the roving patrol condemned in *Almeida-Sanchez* or on a radically shifting basis approximating the peregrinations of such a patrol." *Alvarez-Gonzalez, supra* at 229. As we noted in our first opinion in this case, we have already determined that La Gloria is a permanent checkpoint for the purposes of detaining vehicles for citizenship checks. See *United States v. Santibanez*, 517 F.2d 922, 923 (5th Cir. 1975). The district court heard testimony confirming this classification. Although prior to 1973 the checkpoint was shifted along Highway 1017, the Border Patrol has established the La Gloria checkpoint at a single location. No permanent houses are located at the checkpoint, but it does have permanent road signs, a light pole, an electric power drop, telephone lines and a paved apron for secondary inspections.[4] The Border Patrol classifies La Gloria as a permanent checkpoint—a decision entitled to some deference, see *United States v. Calvillo*, 537 F.2d

158, 161 n.3 (5th Cir. 1976), but manpower shortages prevent the Border Patrol from operating the checkpoint 24 hours a day. Nevertheless, these facts demonstrate that the La Gloria checkpoint has the permanence necessary to alert motorists to its presence and thus reduce the intrusiveness of the stop. See *United States v. Martinez-Fuerte*, 428 U.S. 543, 560, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116, 1129 (1976). Further, all northbound traffic on Highway 1017 is diverted through the checkpoint during its hours of operation just as all traffic at ports of entry is diverted. See *United States v. Hart*, 506 F.2d 887, 896 (5th Cir.), *vacated and remanded*, 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 (1975), *reaff'd*, 525 F.2d 1199 (5th Cir. 1976) (on remand). In short, we agree that the La Gloria checkpoint functions like a permanent border checkpoint.

The second major issue relevant to defining the La Gloria checkpoint as the functional equivalent of the border involves the ratio between international and domestic traffic passing through the checkpoint: "The presence of a continuing and significant percentage of domestic traffic through a given checkpoint cannot but be seen as militating against granting the status of functional equivalency." *Alvarez-Gonzalez, supra* at 229. The district court examined evidence presented by the Border Patrol on the nature of the traffic through the La Gloria checkpoint and concluded that "the interdiction of domestic traffic at the La Gloria checkpoint is relatively minimal." After reviewing the district court's method and the evidence presented, we agree.

Following our earlier remand, the Border Patrol conducted a survey of the traffic passing through the La Gloria checkpoint from December 26, 1976, through January 13, 1977. During this period the Border

---

**3.** We also noted our refusal to regard the international/domestic traffic ratio as dispositive, standing alone, as dicta in *United States v. Bowen*, 500 F.2d 960 (9th Cir. 1974) (en banc) appear to do. And though that decision was in part affirmed by the Supreme Court, 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 these observations were not.

**4.** Counsel for Alvarez-Gonzalez attempted to prove that these fixtures were not present when the search took place in 1974. The district court found that the fixtures were present, and we conclude that his factfinding is not clearly erroneous.

Patrol surveyed 2,216 vehicles. One thousand three hundred thirty-nine vehicles, 60.42% of the total, were determined to be international traffic; 483, or 21.80% of the total, were classified as domestic private vehicles; and 394, or 17.78% of the total, were found to be domestic commercial vehicles. A second survey conducted from January 22, 1977, through January 29, 1977, produced a higher percentage of international traffic. This was understandable, since the first survey was partially taken during the deer season in South Texas during which numerous hunters travelling back and forth repetitively added to the domestic traffic count.[5]

Although this ratio of international to domestic traffic is somewhat low, it is not so low as to foreclose functional equivalent status for the La Gloria checkpoint. International traffic clearly predominates at the checkpoint; the surveys indicate that domestic traffic at the checkpoint does not approach the "majority percentage" that concerned us in *Alvarez-Gonzalez*. 542 F.2d at 229.

One remaining question about this statistical evidence concerns the definition of "international" that lies at its basis. In assessing the checkpoint's "international" traffic, the Border Patrol measured traffic whose journeys leading to the La Gloria checkpoint began in the "immediate border area." In the context of this checkpoint, the "immediate border area" was defined as the area south of U.S. Highway 83, a highway running parallel to and within a few miles of the Texas-Mexico border in South Texas. Thus, the definition included not only those trips to the north that actually commenced *across* the border but also those that began on the Texas shore of this sparsely populated segment of the Rio Grande, including vehicles with registrations from locations in the United States.[6]

The district court adopted this measurement, finding it justified on several grounds. First, it noted our language in the *United States v. Hart, supra,* rejecting "the idea that every vehicle must be shown to have probably crossed the border to be legally stopped at the . . . checkpoint . . . ." 506 F.2d at 895. Second, the district court determined that extreme proximity to the border and the frequency with which persons living along the Texas shore of the Rio Grande visit Mexico support an assumption that a very high proportion of persons travelling from the immediate border area, at least in these long vacant stretches of the river, have crossed the border recently. Third, and most important, evidence of the practical operations of alien smuggling—a matter with which the district judge has long trial experience—persuaded the court to adopt this definition. As the court found, amidst all the permutations and variables of this criminal endeavor as practiced along the Texas-Mexican border, there may be isolated two stable elements almost invariably to be found in every scheme: a rendezvous on the Texas shore of the Rio Grande, with the aliens being responsible for fording the river on foot and presenting themselves there for departure inland, and a resident alien or United States citizen at the rendezvous point who undertakes to smuggle the aliens concealed in an automobile bearing Texas license plates and registration. It is therefore precisely such northward automobile trips as originate on the *Texas* side of the international boundary, and not those which originate in Mexico, which are most likely to involve alien smuggling. It would make little sense indeed to adopt a definition of "international" for this purpose which ex-

---

5. Obviously any bias in these percentages will favor a higher legitimate domestic percentage, since many of those illegals who successfully pass themselves off as legitimate will swell the domestic percentage and shrink the "international" one, while those who evade the point entirely—by hiking around it and rendezvousing with transportation further up the road—will not be counted.

6. While Brownsville and portions of McAllen fall within this definition of the "immediate border area" domestic north-south traffic from these cities is served by two major highways and presumably does not ordinarily traverse the lesser routes monitored by the La Gloria checkpoint.

cluded those very journeys which evidence and practical experience have demonstrated are most likely to commence with an illegal international border crossing. In such situations, although the vehicle has not crossed the border, its cargo has. For purposes, then, of distinguishing between the sort of "international" traffic which the checkpoint should properly scrutinize and the sort of domestic traffic with which it is desired to interfere no more than can be helped, it seems reasonable to include with the international such trips as originate close to this border, have such a close nexus with Mexico, and are so frequently the means of alien smuggling.

Finally, the district court noted the ability of aliens with 72-hour visas (I–186 cards) who legally enter the United States border area to obtain illegal transportation north in Texas vehicles. On consideration of all the above matters, for the purposes of defining functional equivalency, we agree with the district court's definition.[7] And since on this definition the checkpoint monitors predominantly international traffic, it meets the second consideration that we suggested to the district court.

The final consideration we undertake is whether "the checkpoint under consideration actually approximates the effect of one physically located at the border" in that it has "a capability to monitor portions of international traffic not otherwise practically controllable." *Alvarez-Gonzalez, supra* at 229. The district court reviewed the evidence in light of this requirement and concluded that the La Gloria checkpoint

met this final requirement. We agree with the district court's conclusion.

On remand the government presented an impressive array of evidence detailing the uncontrolled access to the United States along the Rio Grande River south of La Gloria. That evidence indicated numerous frequently used paths, trails and roads leading away from the international boundary and eventually connecting to Highway 1017. *See Hart, supra* at 897. Although the La Gloria checkpoint does not rest on an east-west highway paralleling the border, as Interstate 10 does near the Sierra Blanca checkpoint, *see Hart, supra* at 896, the "tributaries" empty into Highway 1017 in much the same way.

■ These facts also reflect the tactical justification for the location of the La Gloria checkpoint. Highway 1017 is one of three major routes from South Texas— Highway 1017, U.S. Highway 281 and U.S. Highway 77. It is the only one of those routes due north of a very long stretch of sparsely populated border area providing uncontrolled access to the United States. The La Gloria checkpoint lies at the confluence of a number of established roads leading away from a sparsely populated segment of the border. La Gloria's location is such that it is the first point at which international traffic from areas of significant uncontrolled access receives scrutiny.[8]

The record of apprehension of illegal aliens at the checkpoint further substantiates this view. The Border Patrol has apprehended a significant number of illegal

7. As noted, the district court's definition assumes that vehicles from the "immediate border area" have a "nexus" with the border justifying this classification as "international" traffic. In other contexts we have held that vehicles with an overall nexus with the border may be subjected to an extended border search. *See United States v. Brom,* 542 F.2d 281 (5th Cir. 1976); *United States v. Flores,* 531 F.2d 222 (5th Cir. 1976).

8. The district court also relied on a "second river" theory to justify the tactical need for a La Gloria's location. The second river theory holds that the La Gloria checkpoint is a second river for aliens who enter the United States with I–186 cards (limiting travel to within 25

miles of the port of entry) and then attempt to move further into the interior of the United States. This theory explains the Border Patrol's decision to place the checkpoint greater than 25 miles from the international boundary but does not otherwise further La Gloria's status as a checkpoint that "actually approximates the effect of one physically located at the border." Functional equivalents are primarily designed to prevent illegal entry into the United States, not overextended entry. The La Gloria checkpoint's ability to monitor aliens with I–186 cards standing *alone* would not qualify it for functional equivalent status; but it is a factor deserving consideration.

aliens at this La Gloria checkpoint despite the fact that it operates the checkpoint only about one-third of the time. In fiscal year 1975, the Border Patrol arrested 497 aliens and 36 alien smugglers; in fiscal year 1976, this number increased to 838 aliens and 149 smugglers arrested. During the first survey period of December 26, 1976, to January 13, 1977, the Border Patrol apprehended 125 aliens and 12 alien smugglers. These figures indicate that the La Gloria checkpoint examines much international and international-connected traffic not previously scrutinized.

The magnitude of the problem of aliens illegally entering or remaining in the United States is staggering. The peculiar characteristics of the Texas-Mexican border—a river inappropriately named Rio Grande in that aliens can swim, wade, and in some places walk across it easily—present serious problems for those enforcing the immigration laws. The Supreme Court has long recognized that the national interests in the protection of the borders justify relaxation of fourth amendment requirements at the border or its functional equivalent. And though in *Almeida-Sanchez* it recognized the concept of a "functional equivalent" of the border, it has not thus far had occasion to provide much guidance in defining such a "functional equivalent." The matter presses upon Texas, however, a state of our circuit, and in these circumstances we have perforce laid down our own guidelines: "relative permanence, relatively minimal interdiction of domestic traffic, and a capability to monitor portions of international traffic not otherwise practically controllable." *Alvarez-Gonzalez, supra* at 229.

In so doing, we recognize that we have struck a balance between the needs of law enforcement and the constitutional rights of residents near the Mexican border to go about their domestic errands without unreasonable searches—a balance that countenances, in a far milder form, some of the measures which moved the Supreme Court to its decision in *Almeida-Sanchez*. But the opinion in that case itself contemplates the existence of points removed from the border which are yet its functional equivalent, and the Court can scarcely have failed to appreciate that citizens who reside in such a location as to have to pass through such a point on their daily rounds will be subjected to an inconvenience which most of their fellows will be spared. Although in some instances citizens may be subject to a full search for contraband at the functional equivalent of the border, *see United States v. Brennan,* 538 F.2d 711, 714–15 (5th Cir. 1976), no such intrusion was contemplated at the La Gloria checkpoint. A more serious interference of this sort could well result in the striking of a different balance in determining a checkpoint's status as the functional equivalent of the border, since the degree of intrusion clearly bears on that status. *United States v. Brennan, supra* at 715–16. But a cursory inspection [9] for alien passengers limited to cavities large enough to contain a human form and conducted at a fixed point is a far cry from the thorough search carried out by the roving commission at a point of its own selection in *Almeida-Sanchez*.

In light of the evidence adduced at the district court's hearing on remand, we hold

**9.** Evidence in this record supports the district court's factual description of the procedures:
Normal procedures of the La Gloria Checkpoint include the stopping of all vehicles, and, depending upon the officers' observations, brief questioning of the occupants concerning their citizenship. The initial stop is made on the highway; following the questioning, which takes only a few seconds, vehicles are allowed to pass through the checkpoint if the occupants' citizenship status is in order. However, if any irregularity or deficiency in documents exists, or if suspicious behavior is exhibited (such as hesitancy to approach the checkpoint), the driver is directed to pull over to the extra lane on the side of the road; the extra lane is used to prevent congestion and the creation of a hazardous condition on the highway. When a search for aliens is determined to be justified, only compartments large enough to conceal a body are scrutinized; a search of most such cavities takes less than a minute.
And it is just "searches of this kind" that the Supreme Court in *Almeida-Sanchez* contemplated might be made at functional equivalents of the border. 413 U.S. at 272, 93 S.Ct. 2535.

that the La Gloria checkpoint meets our guidelines and is the functional equivalent of the border for purposes of an immigration search. Accordingly, the Border Patrol officers who searched Alvarez-Gonzalez' trunk did not require probable cause to do so. His conviction is AFFIRMED.

GOLDBERG, Circuit Judge, dissenting:

Believing that today's decision is inconsistent with the standards we announced in our earlier opinion in this very case, I respectfully dissent. That opinion and earlier decisions indicate that the crucial consideration in the case at bar should be the ratio of domestic to international traffic intercepted at the checkpoint. The La Gloria location, at which border patrol agents almost certainly interdict more domestic than international travelers, is not the functional equivalent of the border.

Searches at the border, based on the "long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country," *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1979, 52 L.Ed.2d 617 (1977), do not require warrants or probable cause. The Supreme Court has made clear, moreover, that such searches need not be conducted precisely at the border itself. Government agents may search at the "functional equivalent" of the border, which may sometimes include interior airports receiving international flights and checkpoints along highways leading from the border. In extending this concept to the La Gloria checkpoint, however, the majority moves away from earlier statements of the Supreme Court and our own circuit. I view the move as unfortunate.

The Supreme Court's one attempt to explicate functional equivalence came in *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Rather than attempt a comprehensive formulation, the Court listed two instances where that concept might apply:

For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches.

For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

*Id.* (footnote omitted).

We explained these examples in our thorough and well-reasoned opinion in *United States v. Brennan*, 538 F.2d 711 (5th cir. 1976). After quoting the above passage from *Almeida-Sanchez*, we said:

In the first example there inheres *a high degree of probability that a border crossing took place* and an attendant likelihood that nothing about the object of the search has changed since the crossing. . . . In the case of the airport search of the nonstop flight, both assumptions become certainties.

538 F.2d at 715 (emphasis added). We sounded the same note in another careful opinion announced almost simultaneously. In *United States v. Calvillo*, 537 F.2d 158 (5th Cir. 1976), we refused to extend border status to the Freer checkpoint, emphasizing that "the functional equivalency label is one not lightly to be bestowed." *Id.* at 160. We noted:

There is no showing that the vehicles passing through the Freer checkpoint were *likely to have recently crossed the border* or that the area was a natural collecting point for illegal aliens making their way into the interior.

537 F.2d at 161 (emphasis added).

Our initial encounter with the case at bar followed closely upon these statements from *Brennan* and *Calvillo*. In *United States v. Alvarez-Gonzalez*, 542 F.2d 226 (5th Cir. 1976) [*Alvarez-Gonzalez I*], we remanded the case for further fact-finding in regard to functional equivalence. In what can be characterized only as a thoughtful and carefully phrased opinion, Judge Gee set forth the standards that were to govern the functional equivalence inquiry. I joined that opinion in the hope that it charted the moderate course adumbrated by the Supreme Court in *Almeida-Sanchez* and adhered to by us in such cases as *Calvillo* and *Brennan*.

*Alvarez-Gonzalez I* identified three major considerations that should guide the inquiry into border status: "relative permanence, relatively minimal interdiction of domestic traffic, [and] a capability to monitor portions of international traffic not otherwise practically controllable." 542 F.2d at 229.[1] Our further explication of the second of these factors, if followed conscientiously, would compel the denial of functional equivalence to La Gloria. We said:

> The presence of a continuing and significant percentage of domestic traffic through a given checkpoint cannot but be seen as militating against granting it the status of functional equivalency. . . . No checkpoint which occasions, day in and day out, the interdiction of *anything approaching a majority percentage* of domestic traffic can properly be seen as approximating the border.

542 F.2d at 229 (emphasis added).[2]

This language from *Alvarez-Gonzalez I* cannot stand alongside the result in the case at bar. The district court determined that 40% of the northbound La Gloria traffic was domestic, 60% international.[3] The court excluded from that category some travelers whose trips were confined wholly within the United States. These trips originated in the "border area," which the majority describes as "sparsely populated," *ante* at 623, but which included the major cities of Brownsville and part of McAllen.[4]

The majority justifies classifying as "international" those trips from one United States location to another on the grounds that such trips play an important role in violations of the immigration laws. While I join the majority's concern for the integrity of those laws, I cannot join its apparent belief that functional equivalency is a concept that frees the border search principle from its historical moorings, the "right of the sovereign to protect itself by stopping and examining persons and property *crossing into this country.*" *United States v.*

1. The first factor, relative permanence, is important in other contexts but provides little guidance in a case such as the one at bar, where the choice is between classifying a location as a "permanent checkpoint" or as a "functional equivalent." Permanent checkpoints are permanent by definition. Thus while I agree La Gloria is permanent (a conclusion I reach without the majority's uncalled for deference to the border patrol's own characterization), I attribute little significance to this conclusion in analyzing functional equivalence.

2. In the omitted portion of the quoted passage we noted the Ninth Circuit's handling of this same criterion:

> [I]f a search takes place at a location where *virtually everyone* searched has just come from the other side of the border, the search is a functional equivalent of a border search. In contrast, if a search takes place at a location where a *significant number* of those stopped are domestic travelers going from one point to another within the United States, the search is not the function equivalent of a border search.

*United States v. Bowen,* 500 F.2d 960, 965 (9th Cir. 1974), *aff'd,* 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975) (emphasis added), *quoted without emphasis in United States v. Alvarez-Gonzalez,* 542 F.2d 226, 229 (5th Cir. 1976). We refused to follow the Ninth Circuit's suggestion that this factor standing alone is always dispositive, but we made clear that "we do emphasize the significance of this consideration." 542 F.2d at 229.

3. These figures derive from a two-week survey the border patrol conducted in response to our remand in *Alvarez-Gonzalez I.* The majority's statement that the international portion was higher in a later five-day survey is unsupportable; during the later survey the border patrol did not attempt to ascertain the proportions of domestic and international traffic. Record at 193. Although during the second survey the average daily number of aliens apprehended was greater than during the first survey, Record at 194, that says nothing at all about the division of all traffic between domestic and international.

4. The majority minimizes the significance of including Brownsville and McAllen, saying that most inhabitants of those cities use other routes when travelling to the north. That there may be few Brownsville residents who pass through the checkpoint, however, has nothing at all to do with whether their trips should be labeled "international;" it affects only the volume and thus the significance of these clearly "domestic" trips. If there are indeed few northbound trips originating in the "border area," then the majority and the border patrol should have little to fear from properly classifying such trips as domestic. It is precisely the interdiction of such domestic travelers upon which *Alvarez-Gonzalez I* focused.

*Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1979, 52 L.Ed.2d 617 (1977) (emphasis added).

Rather than a device for circumventing fourth amendment restraints on searches of those who have not recently entered the country, the functional equivalency concept is one designed merely to allow searches of international travelers at interior points that, when compared to the border itself, are more convenient (because, for example, located at the confluence of two highways, eliminating the need for a border checkpoint on each) or more effective (because, for example, those travelling inward would more likely pass through such a station than through one located on the border itself). In practical operation, any highway checkpoint removed from the border will interdict some domestic travelers, and I certainly do not suggest that that fact prevents the point from achieving border status or casts any doubt on the authority to search such travelers at those locations. I do insist, however, that a checkpoint must achieve the functional equivalency label on the basis of its capacity to intercept international travelers, not on the basis of its ability to stop *intra*-national travelers, however useful such stops might prove in controlling border violations.

This analysis indicates that the crucial factor in differentiating between international and domestic traffic is whether the vehicles' passengers or contents have crossed the international boundary in the immediate past.[5] Not only is this view compelled by the reasoning and overall framework of the Supreme Court's border

search decisions, but it is also the view that *Alvarez-Gonzalez I* seemed implicitly to adopt. In the midst of our discussion of the distinction between international and domestic traffic, we quoted the Ninth Circuit's description of what we labeled "this ratio." 542 F.2d at 229. The Ninth Circuit described the two components of "this ratio" as people who have "just come from the other side of the border" and those who "are domestic travelers going from one point to another within the United States." *United States v. Bowen,* 500 F.2d 960, 965 (9th Cir. 1974), aff'd, 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975), *quoted in United States v. Alvarez-Gonzalez,* 542 F.2d 226, 229 (5th Cir. 1976). In *Alvarez-Gonzalez I* we gave not the slightest hint that we had anything else in mind. Our statements, moreover, were cast from the same lot as our virtually simultaneous references to the "probability that a border *crossing* took place," *United States v. Brennan,* 538 F.2d 711, 715 (5th Cir. 1976) (emphasis added), and to the likelihood that the vehicles "recently *crossed* the border," *United States v. Calvillo,* 537 F.2d 158, 161 (5th Cir. 1976) (emphasis added). There simply is no basis for adopting instead the approach taken by the majority in the case at bar.[6]

We are left, then, with a checkpoint at which the proportion of domestic travelers, properly defined, is 40% plus whatever percentage originates in the "border area" on the United States side. Thus the domestic share probably exceeds 50%.[7] In *Alvarez-Gonzalez I* we flatly declared that, regardless of other criteria, the existence of "anything approaching a majority percentage of

---

**5.** I do not undertake to define the "immediate past" within this formulation. In *Brennan* we spoke of the "likelihood that nothing about the object of the search has changed since the crossing." 538 F.2d at 715. That statement seems completely reasonable. In any event, whatever the appropriate standard, I view as totally unacceptable the majority's intimation that everyone in the border area can be treated as having recently entered the country on the basis of the frequency with which it presumes those persons visit Mexico. *Ante* at 623–624. I would count as "international" only those vehicles containing passengers, whether in

the driver's seat or the trunk, who have just come from Mexico.

**6.** The possibility of counting as "international" those trips wholly within the United States probably never would have received any consideration had the border patrol not chosen to employ the approach when it conducted its survey in response to our opinion.

**7.** The border patrol agent who conducted the survey described as "quite a few" the number of trips originating in only a portion of the United States "border area." Record at 192.

domestic traffic" would preclude functional equivalence classification. 542 F.2d at 229. I would ·adhere to that pronouncement.

Moreover, even accepting the majority's erroneous definition of international, the share of domestic traffic is too great to pass muster. I would have thought it clear that 40% constituted "anything approaching a majority percentage" within the *Alvarez-Gonzalez I* formulation. And even if 40% is not "anything approaching a majority percentage," it certainly qualifies as the "significant percentage" that we said "cannot but be seen as militating against" functional equivalence. 542 F.2d at 229.[8] The majority opinion in the instant case refuses even to acknowledge that the La Gloria ratio so militates, describing domestic traffic instead as "minimal." My hope is that today's result will prove aberrant, with future decisions according more effect to what we said in *Alvarez-Gonzalez I* than to what we do today. By proclaiming adherence to the *Alvarez-Gonzalez I* standards and by merely labeling the La Gloria interdiction of domestic traffic "minimal," the majority certainly leaves room for future courts to confine this case to its facts.[9]

In closing, I must emphasize that I am not insensitive to the law enforcement interests to which the majority pays such heed. The majority may well be correct that allowing searches at La Gloria without probable cause would increase the detection of aliens illegally entering the country. The degree to which that would be true is not free of doubt; many of those apprehended might also be detected if La Gloria were operated simply as a permanent checkpoint, with border patrol agents free to stop all cars, to question all occupants, and to search whenever after the questioning there was probable cause under the none-too-stringent standards that have

emerged in this context. It is this procedure that the Supreme Court chose as an accommodation of the competing governmental and private interests that are implicated here. In opting for a different balance, the majority accords insufficient weight to the Supreme Court's admonition in *Almeida-Sanchez v. United States*, 413 U.S. 266, 274, 93 S.Ct. 2535, 2540, 37 L.Ed.2d 596 (1973):

> It is not enough to argue, as does the Government, that the problem of deterring unlawful entry by aliens across long expanses of national boundaries is a serious one. The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. It is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg Trials:

> "These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Brinegar v. United States*, 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879, (Jackson, J., dissenting).

La Gloria is a garden variety permanent checkpoint. The Supreme Court has held that agents may search at permanent checkpoints only on the basis of probable cause. *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 46 L.Ed.2d 623 (1975). Because the agents here concededly lacked

---

**8.** On this view we would classify La Gloria as the functional equivalent only if the third *Alvarez-Gonzalez I* factor—the "capability to monitor portions of international traffic not otherwise practically controllable"—strongly favored that result.

**9.** If we are indeed to bestow the functional equivalency label as lightly as does the majority, I join wholeheartedly in its suggested limita-

tion to "cursory inspection[s] . limited to cavities large enough to contain a human form." *Ante* at 625. Although traditional border searches are not so limited, I believe the majority has moved beyond traditional border searches. If we are to make that move, I would join an effort to cabin the new concept within reasonable bounds.

probable cause, the conviction should be reversed. I respectfully dissent.