UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles LUDDINGTON,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph Ronald NELUMS,
Defendant-Appellant.

Nos. 78–5394, 78–5412
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Feb. 7, 1979.

Rehearing and Rehearing En Banc
Denied March 5, 1979,
No. 78–5394.

Rehearing and Rehearing En Banc
Denied March 22, 1979,
No. 78–5412.

Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., Robert Ramos, Federal Public Defender, El Paso, Tex., for defendant-appellant in No. 78–5394.

Joseph (Sib) Abraham, Jr., Charles Louis Roberts, El Paso, Tex., for defendant-appellant in No. 78–5412.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, Richard P. Mesa, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before CLARK, GEE and HILL, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The United States Border Patrol maintains a permanent immigration checkpoint facility on Interstate Highway 10 near Sierra Blanca, Texas. In *United States v. Hart,* 506 F.2d 887, *vacated and remanded,* 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706, *reaff'd* 525 F.2d 1199 (5th Cir. 1976) (on remand), *cert. denied* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226, this court held that the Sierra Blanca checkpoint was the "functional equivalent of the border," thus authorizing the Border Patrol to conduct searches of vehicles traveling through the

---

* Rule 18, 5 Cir.; *see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

checkpoint without consent or probable cause. The two appellants in this consolidated appeal were both convicted for the possession of contraband found in their vehicles during searches at the checkpoint conducted without probable cause. Relying on *Hart* and on new evidence gathered at a hearing concerning the operation of the checkpoint, the district court held that the searches were valid because the checkpoint is the functional equivalent of the border. The appellants invite us to overrule *Hart* and revoke the Sierra Blanca checkpoint's legal status as the functional equivalent of the border. We decline the invitation and affirm both convictions.

## I.

Appellant Joseph Nelums drove up to the Sierra Blanca checkpoint early in the evening of February 9, 1978, driving a 1977 MGB sports car with Texas license plates. Nelums was stopped, and pursuant to normal procedure at the checkpoint, was asked questions by a border patrolman concerning his citizenship. Nelums stated that he was an American traveling from El Paso, Texas, to Houston. Although the patrolman observed nothing suspicious or unusual about Nelum's demeanor, the officer's curiosity was aroused by the presence of several articles of clothing in the passenger seat of the car and by an unusually clean, unused tire strapped to the chrome luggage rack on the trunk. Nelums was directed to open the trunk of the MGB, but the position of the luggage rack and tire prevented the trunk lid from opening more than four inches. Peering into the partially open trunk, the patrolman noticed several packages wrapped in plastic. Nelums was referred

to a secondary inspection area where the spare tire was removed and the trunk opened, revealing 138 pounds of marijuana in brick form. Nelums was convicted in a non-jury trial on a single count of possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and sentenced to five years' probation and a $1000 fine. The trial court stated at the conclusion of the suppression hearing that it was "plain" that there was no probable cause and that, if the checkpoint was not the functional equivalent of the border, the search was improper. (S.R. 160).

Appellant Charles Luddington drove up to the Sierra Blanca checkpoint on the morning of February 21, 1978, in a 1971 Pontiac. When asked about his citizenship, Luddington stated that he was an American, on his way to Houston from California. The border patrolman thought that Luddington appeared nervous, and asked Luddington to open the trunk of his car. In the trunk, a sawed-off shotgun was found wrapped in burlap among some garment bags. Luddington was convicted before the same district judge as Nelums' of possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(c), 5871, and given a four-year suspended sentence with five years' supervised probation. As in Nelums' case, the district court found that there was no probable cause to support a search of the car's trunk. (R. 49).

The Nelums and Luddington cases were consolidated by the district court for a joint hearing on the single issue dispositive of both cases: whether the Sierra Blanca checkpoint should retain its judicially approved certification as the functional equivalent of the border.[1]

---

1. In Nelums' case, Nelums made certain self-incriminating statements to Border Patrol agents after the agents gave Nelums his *Miranda* warnings. If we did not determine that the Sierra Blanca checkpoint was the functional equivalent of the border, it would be necessary to decide whether the incriminating statements made by Nelums were the poisonous fruit of an illegal search or were instead purged of their primary taint by the intervening *Miranda* warnings. *See Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416

(1975); *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). The issue was not reached by the trial court and because of our reaffirmance of *Hart* we do not reach it here.

In Luddington's case, the government's fallback position below was that even if probable cause should have existed before Luddington could be ordered to open his trunk, Luddington actually opened his trunk voluntarily and the search was consensual. The trial court did not rule on the consent issue, although it did state

## II.

The Sierra Blanca checkpoint was declared to be the functional equivalent of the border in *United States v. Hart*, 506 F.2d 887, *vacated and remanded*, 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706, *reaff'd* 525 F.2d 1199 (5th Cir. 1976) (on remand) *cert. denied*, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976). Lawrence Hart was stopped at the Sierra Blanca checkpoint and asked about his citizenship. When directed to open the trunk of his car, 397 pounds of marijuana were found. Although this circuit had previously upheld the legality of trunk searches at the Sierra Blanca checkpoint, *United States v. McGlynn*, 496 F.2d 1316 (5th Cir. 1974); *United States v. Hufstetler*, 496 F.2d 1184 (5th Cir. 1974), *Hart* was the first case to uphold such a search based upon a finding that the checkpoint was the functional equivalent of the border.

The phrase "functional equivalent of the border" was used for the first time by the Supreme Court in *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). *Almeida-Sanchez* struck down *roving* border patrol searches made without probable cause, but differentiated such roving searches from searches at permanent checkpoints at the border itself or at its "functional equivalents." 413 U.S. at 272, 93 S.Ct. at 2539. The Court cited as examples of "functional equivalents" "an established station near the border, at a point marking the confluence of two or more roads that extend from the border" and "a search of passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City." 413 U.S. at 273, 93 S.Ct. at 2539.

"*Hart I*," reported at 506 F.2d 887, held that the Sierra Blanca checkpoint was the functional equivalent of the border as that term was used in *Almeida-Sanchez*. *Hart I* reached its conclusion with the following discussion:

The Sierra Blanca checkpoint is located approximately 75–85 miles southeast of El Paso, Texas, and 4 miles west of Sierra Blanca, Texas, on Interstate Highway 10. Leaving El Paso Interstate 10 parallels the United States-Mexico border in a southeasterly direction for approximately 50 miles, coming within two miles of the border itself at many places. Before reaching the checkpoint, Interstate Highway 10 turns in a northeasterly direction away from the border with the result that, at the checkpoint itself, the highway runs in an east-west direction.

Along the 85 mile stretch of road between El Paso and the Sierra Blanca checkpoint, there are three ports of entry. The first is located at Ysleta, Texas, a suburb of El Paso. The second port of entry is located at Fabens, Texas, approximately 30 miles southeast of Ysleta, and the third is situated at Fort Hancock, Texas, roughly 18 miles southeast of Fabens. Paralleling the border, the distance from the Fort Hancock port of entry to the Sierra Blanca checkpoint is about 30 miles.

The ports of entry at Fabens and Fort Hancock are opened at 6:00 a. m. and closed at 9:00 p. m. on a daily basis. When a port of entry is closed, a gate is positioned across the road to prevent traffic from proceeding. The fact that these ports are closed, however, does not mean vehicles or individuals cannot cross the border, inasmuch as there are numerous roads, both paved and dirt, which lead from the banks of the Rio Grande River, which marks the border, to Interstate Highway 10 and do not pass through a port of entry.

The Sierra Blanca checkpoint itself is situated 20 land miles and 14 air miles from the United States-Mexico border. Since July 8, 1973, the checkpoint has been manned 16 hours a day on weekdays and 24 hours a day on weekends, weather and manpower permitting. The hours of operation of the Sierra Blanca checkpoint are approximately 4:00 p. m. to 8:00 a. m.

The purpose of the instant checkpoint is to detect and apprehend aliens who

that no probable cause existed. (R. 49). Again, we do not reach the issue because of our

holding in the functional equivalency status of the checkpoint.

have entered the United States illegally. Between November 1, 1972, and November 30, 1973, officials at the Sierra Blanca checkpoint apprehended 1,291 such aliens. Although the Quitman Mountains are immediately south of the checkpoint, there are various paths and trails leading from the border, through the mountains, into the United States and to Interstate Highway 10.

The Sierra Blanca checkpoint is permanent in nature. Approximately one mile west of the checkpoint on Interstate Highway 10, there is a sign which reads, "Inspection station, all vehicles exit one mile." Somewhat closer to the checkpoint, between one-half and three-fourths of a mile west, a second sign reads, "Form one lane right." One thousand yards west of the checkpoint, a third sign states, "Inspection station, all vehicles right lane."

During the hours that the Sierra Blanca checkpoint is open, there are cones positioned in the highway which direct all traffic onto a paved access road to the checkpoint. At the checkpoint itself, there are three stop signs, two with flashing red lights, and a trailer mounted on blocks which the checkpoint officials use as an office. Although all vehicles traveling east on Interstate Highway 10 pass through the checkpoint when it is in operation, the officials do not stop every vehicle and search for aliens. In practice the officials wave some cars and trucks through the checkpoint and stop others to question their occupants.

Certain of these many characteristics may be more important than others in establishing the Sierra Blanca checkpoint as a functional equivalent of the border. One, the checkpoint is permanent in nature. Two, all traffic is diverted through the checkpoint during its hours of operation just as all traffic would be channeled through a port of entry at the border itself. Three, the Sierra Blanca checkpoint operates during the hours when the ports of entry at Fabens and Fort Hancock are closed. Four, Interstate Highway 10 parallels the border for some 50

miles before turning northeast to the checkpoint and the highway comes within two miles of the border itself in many points. Five, there are numerous roads, paths, trails which lead from the border to Interstate Highway 10 which do not pass through any port of entry. And, six, during one thirteen-month period officials at the Sierra Blanca checkpoint apprehended 1,291 aliens who had entered the United States illegally. *Cf. United States v. Byrd*, 483 F.2d 1196, 1199, n. 7 (5th Cir. 1973), modified, 494 F.2d 1284 (5th Cir. 1974). We need not decide which of these factors are absolutely necessary in order to hold that the synergistic effect of these physical and operational characteristics elevates the Sierra Blanca checkpoint to the status of the border's functional equivalent for a § 1357 search.

506 F.2d at 896–97. The Supreme Court vacated and remanded *Hart I* at 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706, for reconsideration in light of *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); and *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

*Brignoni-Ponce*, like *Almeida-Sanchez*, condemned roving border patrol stops made in the absence of specific articulable facts reasonably warranting suspicion that a vehicle contains illegal aliens. 422 U.S. at 884, 95 S.Ct. at 2582. The Court in *Brignoni-Ponce* limited roving patrol non-probable cause searches to "the border and its functional equivalents." *Id.* *Ortiz* dealt with a search at a permanent checkpoint on Interstate Highway 5 near San Clemente, California, 66 road miles north of the Mexican border. The government in *Ortiz* did not contend that the San Clemente checkpoint was the functional equivalent of the border. 422 U.S. at 892, 95 S.Ct. at 2586. *Ortiz* squarely held that even at permanent checkpoints border patrol agents could not search vehicles without probable cause unless the checkpoint was at the border or its functional equivalent. 422 U.S. at 896–97, 95 S.Ct. at 2589. In neither *Brignoni-Ponce*

nor *Ortiz* did the Supreme Court attempt to define the term "functional equivalent."

On remand in *Hart II,* 525 F.2d 1199, this court stated that nothing in *Brignoni-Ponce* or *Ortiz* caused it to doubt the validity of its original determination in *Hart I* that the Sierra Blanca checkpoint is the functional equivalent of the border, and it reaffirmed the validity of non-probable cause searches at the checkpoint. 525 F.2d at 1200. The Supreme Court denied certiorari. 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226.

### III.

■ The appellants urge us to overrule *Hart* on the basis of intervening developments in the case law on functional equivalency and updated information on the operation of the Sierra Blanca checkpoint facility.

Since *Hart,* this circuit has adopted a tripartite test for determining whether functional equivalency status should be granted: the "relative permanence of the checkpoint; minimal interdiction by the checkpoint of the flow of domestic traffic; and the practical necessity of the substitution of the interior checkpoint for the border in order to monitor international traffic." *United States v. Reyna,* 572 F.2d 515, 517 (5th Cir. 1978) (Sarita, Texas checkpoint); *United States v. Alvarez-Gonzalez,* 542 F.2d 226, 229 (5th Cir. 1976) (remanding for findings), 561 F.2d 620, 621–22 (5th Cir. 1977) (on appeal from remand) (La Gloria, Texas checkpoint).

Only the first and third factors of the currently operative three-part test were applied to the Sierra Blanca checkpoint in *Hart.* *Hart* found that (1) the checkpoint facility was relatively permanent and continuous in its operation, and (2) the physical location of the checkpoint was a practical necessity as a substitute for several checkpoints actually located at the border. 506 F.2d at 896–97; *see also United States v. Alvarez-Gonzalez,* 542 F.2d 226, 229 (5th Cir. 1976) (interpreting the factors considered in *Hart* ).

The record compiled in this case confirms both the permanence and strategic impor-

tance of the Sierra Blanca checkpoint. The checkpoint is now operated around the clock 7 days a week; it is closed down only when adverse weather makes the diversion of traffic a safety hazard or when a border patrolman does not report for his scheduled duty shift. The Rio Grande River, despite its imposing name, is not an obstacle to border crossings in the area to the west of Sierra Blanca. Here, the river can be easily driven, waded, or swum across at all times, and often has either no surface flow at all or merely a bare trickle. *Hart, supra,* 506 F.2d at 897; *Alvarez-Gonzalez, supra,* 561 F.2d at 625. In the 85-mile stretch from El Paso to the Sierra Blanca checkpoint, there are myriad opportunities to make surreptitious crossings of the river with ease. Many foot paths, dirt roads, and trails lead across the river without passing through Ports of Entry. Since Interstate 10 roughly parallels the river at a distance of 2 to 5 miles along the entire stretch from El Paso to the checkpoint, however, all paths leading from the border eventually find their way to the highway. The purpose of the Sierra Blanca checkpoint is to interdict that illegal alien traffic which turns eastward into the heart of Texas after reaching the interstate. The checkpoint is located at a point where the interstate cuts through a pass in the Quitman Mountains. Furthermore, the mountains form a natural funnel through which eastbound traffic from the border areas must flow. One small road in the mountains can be taken to circumvent passage through the checkpoint, but the Border Patrol has planted sensors in the road to detect any traffic over that route.

We recently referred to the problem of illegal alien entry from Mexico as "staggering," *Alvarez-Gonzalez, supra,* 561 F.2d at 625. Short of physically patrolling the entire length of the Rio Grande, strategically well-located checkpoints are the most effective means of dealing with this serious problem. The Sierra Blanca checkpoint is obviously a vital deterrent to the flow of illegal alien traffic through its assigned area. There is ample evidence to support the district court's finding that "[t]he Sier-

ra Blanca checkpoint actually approaches the effect of a checkpoint physically located at the border, as it has a capability to monitor portions of international traffic not otherwise practically controllable."

The only aspect of the current three-part test which *Hart* did not consider is the precise degree of interdiction of domestic traffic. There is no hard data available on the ratio of domestic to international traffic traveling through the checkpoint, because the Border Patrol does not keep statistics on either the amount or the origination of traffic diverted from the regular roadway surface or, more importantly, the amount or origination of such traffic as is physically interdicted by being required to stop. The defendant's expert from the Texas Highway Department was able to provide some estimates of traffic patterns which passed the checkpoint, but no estimate of the actual ratio of domestic to international traffic was made. Faced with the paucity of firm information, but recognizing the significance of the issue, the district court entered virtually all of the raw data before it into its findings and then drew conclusions. We agree with the district court's approach and affirm its conclusion that the record does not justify overturning *Hart* and "decertifying" the checkpoint.

There is no disputing the assertion that as a matter of sheer volume, the effect of the checkpoint on domestic traffic is significant. The Texas Highway Department estimated that 2,700,000 people per year pass eastward through the checkpoint. Interstate 10 is one of the major arteries of the interstate highway system, stretching coast to coast from Los Angeles to Jacksonville, Florida. Interstate 10 is a route of preference for truckers, bus drivers, and other travelers because it is snow- and ice-free virtually the year round.

In the immediate area surrounding the Sierra Blanca checkpoint, however, it is likely that the majority percentage of traffic on the interstate is international. What statistics do exist indicate that over 2 million persons per *month* cross the border from Mexico in the El Paso sector at established Ports of Entry. The record, of course, does not reflect how many more illegal crossings occur outside of points of entry. The court found that "the proximity of the Sierra Blanca checkpoint to the border and the frequency with which persons living between El Paso and Ft. Hancock visit Mexico, support the assumption that a very high proportion of the persons traveling from the immediate border area to the Sierra Blanca checkpoint have crossed the Mexican border within a short time before their journey through the Sierra Blanca checkpoint." As we held in *Alvarez-Gonzalez*, international traffic for checkpoint testing purposes must include traffic originating close to the border but on the American side, since vehicles which remain in this country and await their illegal human cargo are a principal means of alien smuggling. 561 F.2d at 624. Finding that the "majority of traffic passing through the Sierra Blanca checkpoint has its inception in the immediate border area," the court held that the checkpoint monitors predominantly international traffic. Although firm statistical data was lacking, the conclusions of the district court are logical inferences drawn from the record.

## IV.

Functional equivalency is to be determined by looking at the checkpoint's permanence, physical location, and degree of interdiction of domestic traffic. All three considerations must be factored into the equation; and no one factor alone is determinative. *Alvarez-Gonzalez, supra*, 542 F.2d at 229. *Compare United States v. Bowen*, 500 F.2d 960, 965 (9th Cir. 1974), *aff'd on other grounds*, 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641. Given its unique geographic situation, the Sierra Blanca checkpoint meets two of the three factors without question. It is permanent and has every physical attribute required for functional equivalency. The third consideration, interdiction of purely domestic travel, is not equally self-proving. Nevertheless, the diversion of only eastbound traffic which has flowed parallel to the

river for approximately 50 miles, and the further selective interdiction of only portions of that traffic, clearly indicate this test, too, has been met. Under these circumstances, the authority of *Hart* continues unimpaired by later reasoning or subsequent changes of fact, and the Sierra Blanca checkpoint retains its status as the functional equivalent of the border.

The convictions are

AFFIRMED.