**UNITED STATES of America**

v.

**Faustino VILLASENOR–MEDINA.**

**No. DR–78–CR–60.**

United States District Court,
W. D. Texas,
Del Rio Division.

April 12, 1979.

Sidney Powell, John E. Murphy, Asst. U.S. Attys., San Antonio, Tex., for plaintiff.

Scott C. Colky, Chicago, Ill., Robert A. Shivers, San Antonio, Tex., for defendant.

## MEMORANDUM ORDER DENYING MOTION TO SUPPRESS

SUTTLE, District Judge.

On February 22nd and 23rd, 1979, this court held an evidentiary hearing on the Defendant's motion to suppress evidence obtained as a result of the stop and search of a U–Haul truck that he was driving on October 8, 1978, on U.S. Highway 57 approximately 12 miles northeast of Eagle Pass, Texas. After a full hearing, the court orally denied the Defendant's motion to suppress. The court now enters its findings of fact and conclusions of law. Any conclusion of law deemed to be a finding of fact is adopted as such. Conversely, any finding of fact deemed to be a conclusion of law is also adopted as such.

### FINDINGS OF FACT

1. Uniformed agents of the U.S. Border Patrol stopped a U–Haul truck being driven by the Defendant at approximately 11:00 P.M. on October 8, 1978. The stop was made at a checkpoint located approximately 12 miles northeast of Eagle Pass, Texas, on U.S. Highway 57. The checkpoint had been set up at 6:30 P.M. that evening, and 60 to 100 cars had passed through it ahead of the Defendant's vehicle.

2. Agent Moring stopped the Defendant's vehicle. He identified himself as a Border Patrolman and asked the Defendant his citizenship. Meanwhile, Agents Vargas

and Carmichael were walking around the vehicle with their flashlights. The Defendant responded that he was from Mexico and produced documentation regarding his status as a permanent resident alien. Moring then asked the Defendant where he was going. The Defendant replied that he was going to San Antonio.

3. Agents Carmichael and Vargas observed fresh, muddy footprints imbedded with grass on the back step of the U–Haul truck. To these experienced agents, it appeared that people had gotten into the back of the truck from a muddy area. Consequently, Carmichael and Vargas told Moring to ask the Defendant what he was hauling. The Defendant replied that he was hauling furniture. However, Carmichael knew from experience that that particular kind of U–Haul truck was usually equipped with a ramp, and that, if furniture had been loaded onto it, such a ramp would probably have been used.

4. The weather had been clear and dry that day, and the officers knew that there were no rivers between Eagle Pass and the checkpoint. They knew that the Rio Grande did have mud on its banks and that it was only 14 miles away. They also knew that alien smugglers frequently use vehicles such as U–Haul trucks, vans, trailers, and other rental vehicles to transport illegal aliens.

5. Believing that some illegal activity was underway, Carmichael and Vargas told Moring to have the Defendant get out and open the rear of the truck.

6. The Defendant got out of the cab and went to the rear of the truck. He opened the rear door, although he had some difficulty in doing so because he was visibly shaking. Twenty-three illegal aliens were in the back of the truck. At this point, the Defendant was placed under arrest, and he and the aliens were taken back to the Border Patrol station in the U–Haul truck.

▮ 7. The checkpoint on Highway 57 is located at the intersection of that highway with the old Uvalde Road, at the base of a small hill. This checkpoint, which will be referred to as the Eagle Pass checkpoint, has been operated at that location since as long ago as 1954. The checkpoint has been officially designated as a "permanent checkpoint" by the Border Patrol since 1974.[1] The agent in charge of the Eagle Pass Border Patrol station has instructions from sector headquarters in Del Rio to man the checkpoint whenever it is possible. The checkpoint has been operated as manpower, weather conditions, and effectiveness have permitted.

8. The checkpoint would be manned 24 hours a day if the manpower were available. Because of traffic safety considerations, the checkpoint is not operated at all when the weather is inclement.

9. The purpose of the checkpoint is to detect and apprehend aliens who have entered the United States illegally. The checkpoint is strategically located—at the intersection of two roads and at the base of a hill, in an area where there is extremely heavy alien traffic. To be strategically located, a checkpoint must be far enough away from the border to be beyond potential pickup points but not so far as to give smugglers too many getaway routes.

10. The checkpoint is operated an average of 12 times per month. In 1978 the checkpoint was in operation approximately 5% of the time. It was operated for a total of 477 hours—12 hours in January, 3 in February, 40 in March, none in April (no men available), 32 in May, 23 in June, 80 in July, 77 in August, 56 in September, 68 in October, 21 in November, and 65 in December.[2] The Border Patrol has found the eve-

---

1. The Border Patrol's designation of permanency is entitled to "some deference." *United States v. Alvarez-Gonzalez*, 561 F.2d 620, 622 (5th Cir. 1977). *See* also *United States v. Martinez-Fuerte*, 428 U.S. 543, 559–60 n. 13, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

2. The Border Patrol checkpoint at La Gloria, Texas, was operated for a total of 2,444 hours in 1978. The checkpoint at Randado was operated only in February, March, and May of 1978, for a total of 331 hours. Each of these checkpoints is not only permanent but also a func-

ning hours to be the most productive for operating the checkpoint; however, because there are rarely more than two men available to work the checkpoint, it must be closed down whenever someone is apprehended.

11. When the checkpoint is not manned, it is distinguishable from other stretches of Highway 57 by a paved apron 220-feet by 36-feet on the northbound side of the road, a permanent trash can, and a sign indicating the junction of Highway 57 and the old Uvalde Road.

12. When the checkpoint is in operation, as it was on the evening of October 8, 1978, it is clearly marked by large signs with flashing lights indicating, "Slow," "Stop Ahead," and "Stop," as well as by signal cones. The "Slow" sign is placed approximately ½ mile before the actual "Stop" sign. Two-hundred yards from the "Slow" sign, toward the "Stop" sign, is a sign that says "Stop Ahead." The "Stop" sign itself is placed at the checkpoint near the paved apron. Signal cones mark the traffic lanes. A marked car and a van used to carry equipment are usually parked on the side of the road at the checkpoint.

13. The checkpoint is always set up in this way at this location. Border Patrol agents who work the checkpoint have no discretion as to when the checkpoint will be in operation or as to which car to stop. All northbound cars approaching the checkpoint are stopped, and a citizenship inquiry is conducted that usually lasts less than a minute.

14. The Del Rio sector of the Border Patrol is responsible for approximately 205 miles of border area, from Sanderson to Carrizo Springs. This figure does not include the meanders of the Rio Grande River, the inlets, and the bays. The river is easily fordable at almost any point, and there are innumerable crossing points, paths, and trails leading from the river that do not pass through a Port of Entry. There are 12 very active crossing points at Eagle Pass alone; and 18 to 20 roads run from the border to U.S. Highway 277, which intersects with Highway 57. Highway 277 closely parallels the border for some 50 miles north of Eagle Pass and roughly parallels it south of Eagle Pass. Illegal aliens also use the creeks and ranch roads. Furthermore, the majority of aliens who enter the country illegally as far down the river as El Indio, or as far up as Quemado, come back through Eagle Pass and proceed to the interior of the country via Highway 57.

15. The problem of illegal entry by aliens is overwhelming. Over 54,000 deportable aliens were apprehended in the Del Rio sector in 1978. Ninety-nine percent were apprehended in the immediate border area. Of these, 15,560 were apprehended in the vicinity of Eagle Pass. At the Eagle Pass checkpoint itself, 42 smugglers and 235 illegal aliens were apprehended in 1978. These last figures indicate that the checkpoint examines much international and international-connected traffic not previously scrutinized.

16. At least 80% of the traffic moving northeast on Highway 57 through the checkpoint is international in nature—that is, coming from across the border or originating close to the border but on the American side.[3] At least 50% of the traffic comes from across the border itself. Many of the vehicles have Mexican license plates, and many are cars that have gone down to the border area or are leaving that area to go towards San Antonio. The proximity of the checkpoint to the border and the frequency with which persons living along the Texas shore of the Rio Grande visit Mexico support the inference that a very high proportion of persons travelling from the immediate border area to the checkpoint have crossed the Mexican border within a short time before passing through the checkpoint.

tional equivalent of the border. *United States v. Alvarez-Gonzalez,* 561 F.2d 620 (5th Cir. 1977) (La Gloria); *United States v. Wilson,* 553 F.2d 896 (5th Cir. 1977) (Randado).

3. By "close to the border but on the American side" the court refers to the area southwest of U.S. Highway 277 from Quemado to Eagle Pass and southwest of Texas Farm Road 1021 from Eagle Pass to El Indio.

17. The area of responsibility for the Eagle Pass Border Patrol station includes the major part of Maverick County. This area is sparsely populated. The Quemado Valley and Normandy communities have a population of approximately 700 people; El Indio has a population of approximately 300. Eagle Pass, the largest population center in the area, has a population of approximately 20,000 and lies southwest of Highway 277.

18. Large numbers of aliens use major crossing points in the Eagle Pass station area because it is so sparsely populated. They then come back up Highway 277, which parallels the border, and proceed to the interior via Highway 57. Because of the sparse population of the area lying northwest and southeast of the checkpoint, there is only slight intrusion on northbound domestic traffic.

## CONCLUSIONS OF LAW

1. Jurisdiction is proper in this court.

2. Although the Defendant's motion to suppress was not timely filed, in the interests of justice the court has considered the motion on its merits.

3. Hearsay evidence is admissible at a hearing on a motion to suppress. *United States v. Lee*, 541 F.2d 1145 (5th Cir. 1976).

4. The Fifth Circuit has adopted a tripartite test for determining whether a checkpoint is the functional equivalent of the border: the relative permanence of the checkpoint; minimal interdiction by the checkpoint of the flow of domestic traffic; and the practical necessity of the substitution of the interior checkpoint for the border in order to monitor international traffic. *United States v. Luddington*, 589 F.2d 236, 240 (5th Cir. 1979); *United States v. Alvarez-Gonzalez*, 542 F.2d 226, 229 (5th Cir. 1976) (remanding for findings), 561 F.2d 620, 621–22 (5th Cir. 1977) (on appeal after remand); *United States v. Reyna*, 572 F.2d 515, 517 (5th Cir.), *rehearing en banc denied*, 575 F.2d 881 (5th Cir. 1978). All three factors must be taken into account,

and no one factor alone is determinative. *United States v. Luddington, supra*, 589 F.2d at 241. International traffic includes traffic originating close to the border on the American side. *Id.*, 589 F.2d at 242; *United States v. Reyna, supra*, 572 F.2d at 517; *United States v. Alvarez-Gonzalez, supra*, 561 F.2d at 622–24.

5. The Eagle Pass checkpoint operates as the functional equivalent of the border. Accordingly, vehicles that pass through it may be stopped and searched without reasonable suspicion or probable cause to believe that a violation of the law has occurred. *United States v. Bender*, 588 F.2d 200, 201 (5th Cir. 1979).

6. Accordingly, the motion to suppress should be, and hereby is, denied.

As an alternative theory for denying the motion to suppress, the court makes the following additional conclusions of law:

7. The Eagle Pass checkpoint is a permanent checkpoint within the meaning of *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). *See United States v. Wilson*, 553 F.2d 896, 897–98 n. 4 (5th Cir. 1977); *United States v. Macias*, 546 F.2d 58, 61 (5th Cir. 1977); *United States v. Alvarez-Gonzalez, supra*, 561 F.2d 620, 622 (5th Cir. 1977).

8. Accordingly, a vehicle may be stopped at the checkpoint for a citizenship inquiry of its occupants without reasonable suspicion that it contains illegal aliens. *United States v. Martinez-Fuerte, supra*, 428 U.S. at 562. However, the search of a vehicle must be supported by consent or by probable cause to believe that it contains illegal aliens. *Id.*, 428 U.S. at 567, 96 S.Ct. 3074; *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

9. In determining whether there is probable cause to search, the Border Patrol agents are entitled to draw reasonable inferences from the facts they observe in light of their knowledge of the area and their prior experience with aliens and smugglers. *United States v. Ortiz, supra*, 422 U.S. at 897, 95 S.Ct. 2585; *United*

*States v. Arredondo-Hernandez,* 574 F.2d 1312, 1315 (5th Cir. 1978).

 10.  The following facts and reasonable inferences therefrom gave the Border Patrol agents probable cause to search the Defendant's U–Haul truck for illegal aliens:

A.  U–Haul trucks are frequently used by alien smugglers;

B.  There were fresh, muddy footprints imbedded with grass on the back step of the truck;

C.  It was a clear day, and there were no rivers in between Eagle Pass and the checkpoint;

D.  If the Defendant had been hauling furniture, he probably would have used a ramp to load the truck;  and

E.  The mud most probably came from the banks of the Rio Grande.

11.  In view of the mobility of the vehicle, the potential for flight, and the agents' situation at the checkpoint, exigent circumstances were present to justify a warrantless search.  *United States v. Troise,* 483 F.2d 615, 617 (5th Cir.), *cert. denied,* 414 U.S. 1066, 94 S.Ct. 574, 38 L.Ed.2d 471 (1973).

12.  Accordingly, on this alternative theory, the motion to suppress should also be, and hereby is, denied.

SO ORDERED this 12th day of April, 1979.