The UNITED STATES of America,
Plaintiff-Appellant,

v.

Mario Alejandro OYARZUN,
Defendant-Appellee.

The UNITED STATES of America,
Plaintiff-Appellant,

v.

Charles JACKSON and Anthony Wayne
Browning, Defendants-Appellees.

Nos. 84–1258, 84–1523.

United States Court of Appeals,
Fifth Circuit.

May 6, 1985.

Hill, Circuit Judge, filed specially con-
curring opinion.

Edward C. Prado, U.S. Atty., Sidney Powell, Asst. U.S. Atty., Ricardo Gonzales, San Antonio, Tex., for plaintiff-appellant in No. 84–1258.

Albert Diamond, Miami, Fla., for defendant-appellee in No. 84–1258.

Helen M. Eversberg, U.S. Atty., Sidney Powell, Ricardo Gonzalez, San Antonio, Tex., for plaintiff-appellant in No. 84–1523.

Roddy Harrison, Pecos, Tex., for Jackson.

Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., Kevin E. Shannon, Robert Ramos, Asst. Federal Public Defenders, El Paso, Tex., for Browning.

Before JOHNSON and HILL, Circuit Judges, and BOYLE\*, District Judge.

JOHNSON, Circuit Judge:

This consolidated appeal arises from two separate automobile searches by United States Border Patrol agents at the Sierra Blanca, Texas, permanent checkpoint. Defendant Oyarzun was arrested after a search of his vehicle uncovered a firearm, with its serial number filed off, hidden underneath the back seat of the car. Defendants Jackson and Browning were arrested after border patrol agents found approximately 3,500 Preludin pills in a cosmetic case in the trunk of their car. In separate proceedings in district court, the defendants in both cases filed motions to suppress the evidence obtained in the searches. The court, the same judge presiding at both proceedings, ordered suppression of the seized evidence on grounds that each search exceeded the scope of a valid search at a permanent border patrol checkpoint. The Government appeals, contending that law enforcement officers may search a vehicle for contraband at a checkpoint that operates as the functional equivalent of the border without consent, probable cause, a warrant, or even reasonable suspicion. For the reasons set forth below, we vacate the district court's order suppressing the evidence in both cases.

## I. FACTS AND PROCEDURAL HISTORY

### A. *United States v. Oyarzun*

The evidentiary hearing on Oyarzun's motion to suppress established the following facts: On December 17, 1983, Oyarzun, driving a 1983 Pontiac Grand Prix, approached the Sierra Blanca checkpoint.[1] Oyarzun was hesitant in approaching the stop. When border patrol agent Robert Saenz asked Oyarzun about his citizenship, first in English and then in Spanish, Oyarzun looked surprised and did not respond. Saenz asked Oyarzun for his permit. Because Oyarzun still looked surprised, Saenz told him to pull off the road into the secondary inspection area.

At the secondary inspection area, Oyarzun got out of his car, fumbling around in his wallet as border patrol agents Arthur Bullock and John Stensel approached him. Agent Stensel asked Oyarzun in Spanish

---

\* District Judge of the Eastern District of Louisiana, sitting by designation.

1. For a detailed description of the Sierra Blanca checkpoint and its operations, see *United States v. Hart,* 506 F.2d 887, 896–97 (5th Cir.) (*Hart I*), *vacated and remanded,* 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 (1975), *reaff'd on remand,* 525 F.2d 1199 (5th Cir.) (*Hart II*), *cert. denied,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976).

for his immigration papers and Bullock asked him to open the trunk. When Oyarzun opened the trunk, Bullock noticed that the spare tire was not securely mounted and that the trunk frame next to the back seat had been taped with gray duct tape. Bullock's two years' experience as a border patrol agent led him to suspect that contraband might be hidden in the car. He slit the duct tape, but saw nothing.

Meanwhile, Stensel was interviewing Oyarzun. Oyarzun produced documentation establishing that he was a Chilean national and that he was legally residing in the United States on a temporary basis. Bullock relayed his suspicions to Stensel, and Stensel then conducted an interior examination of the car. Stensel saw that the rear seat was not fastened to the floorboard, and lifted the seat. He there discovered a .38 caliber automatic pistol from which the serial number had been filed away. While Stensel was examining the interior of the car, Bullock continued his search of the trunk and discovered a brown paper bag and a suitcase which together contained over $30,000 in cash. Oyarzun's arrest followed.

A federal grand jury indicted Oyarzun on one count of unlawfully transporting in interstate commerce a firearm with the serial number obliterated, in violation of 18 U.S.C. §§ 922(k) and 924(a).[2] Oyarzun moved to suppress the evidence seized during the search of his car on the grounds that the search exceeded the scope of a valid checkpoint search for illegal aliens and that the border patrol agents lacked probable cause to search for contraband. The district court granted the motion in open court, followed by its filing of written findings pursuant to Federal Rule of Criminal Procedure 12(e).

B. *United States v. Jackson and Browning*

On March 31, 1984, Charles Jackson drove a 1984 Chrysler LeBaron bearing California license plates into the Sierra Blanca checkpoint. Anthony Wayne Browning was a passenger in the car. While border patrol agents were questioning Jackson and Browning about their citizenship, Agent Fogt observed cigarette rolling papers and a glass pipe on the rear floorboard of the vehicle. At Fogt's direction, Jackson opened the trunk, where the agent found a cosmetic case containing bottles of pills and a cardboard box containing twenty-four bottles marked "Preludin" with 100 pills in each bottle. The agents also discovered a small amount of marijuana residue in the back seat of the car and a paper bag containing cotton balls and a metal scrub pad underneath the front seat.

Jackson and Browning were indicted by a federal grand jury on April 18, 1984, with conspiracy to possess Preludin, a controlled substance, with intent to distribute and with possession with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846.[3]

---

2. These statutes provide:
 § 922. **Unlawful acts**
 . . . .
 (k) It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered.
 § 924. **Penalties**
 (a) Whoever violates any provision of this chapter or knowingly makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or in applying for any license or exemption or relief from disability under the provisions of this chapter, shall be fined not more than $5,000, or imprisoned not more than five years, or both, and shall become eligible for parole as the Board of Parole shall determine.

3. 21 U.S.C. § 841 provides in pertinent part:
 (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;
 . . . .
 Section 846 states:
 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

Both defendants moved to suppress the evidence seized from their automobile. The district court granted the motion.

### C. District Court's Findings

■ In *Oyarzun*, the district court initially acknowledged that this Court has held the Sierra Blanca checkpoint to be the functional equivalent of the border.[4] *See United States v. Dreyfus-de Campos*, 698 F.2d 227 (5th Cir.), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983); *United States v. Luddington*, 589 F.2d 236 (5th Cir.), *cert. denied*, 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 666 (1979); *United States v. Hart*, 506 F.2d 887 (5th Cir.) (*Hart I*), *vacated and remanded*, 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 (1975), *reaff'd on remand*, 525 F.2d 1199 (5th Cir.) (*Hart II*), *cert. denied*, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976). After analyzing Fifth Circuit precedent,[5] the district court concluded that our cases have restricted searches without probable cause at functional equivalents of the border to searches for illegal aliens. Having made this determination the district court went on to establish the scope of a vehicle search at a permanent checkpoint such as Sierra Blanca: Agents may validly stop any vehicle for any reason and may search the vehicle for illegal aliens. The scope of the search, which may be conducted without probable cause or reasonable suspicion, is limited to large areas of the vehicle in which aliens could be hidden. Agents may not conduct any further search of the vehicle or its contents, however, unless they have probable cause to continue the search or have obtained a valid search warrant or the consent of the vehicle's occupants. The district court then held that the border patrol agents lacked probable cause to search Oyarzun's car for contraband, that an illegal alien could not have hidden under the rear seat, and that the search was therefore unlawful.

In *Jackson* and *Browning*, the district court rejected the Government's contentions that the scope of vehicle searches at the Sierra Blanca checkpoint is unfettered by any restraints whatsoever. Instead, the court found that some measurable objective criteria of criminal activity must be in evidence. Further, the court held that the agent was fully justified in examining the trunk area of Jackson and Browning's car; but in the absence of probable cause or reasonable suspicion of criminal activity, defendants' luggage could not be validly searched. *Jackson* and *Browning*, Record Vol. 2 at 22.

### II. THE LAW

The issue raised by this appeal—whether law enforcement officers may search a vehicle for contraband (as well as aliens) at a functional equivalent of the border without a warrant, consent, probable cause, or even reasonable suspicion—points up the uncertain and ostensibly conflicting state of Fifth Circuit border search case law. We

---

**4.** A court may take judicial notice of the functional equivalent status of a particular checkpoint once it has been established. *United States v. Salinas*, 611 F.2d 128 (5th Cir.1980). Indeed, "[i]t is not required that the underlying facts concerning a particular checkpoint location be proved over and over again in each case arising out of the same checkpoint location, so long as such facts remain unchanged." *Id.* at 130. Neither of the defendants in this consolidated appeal contested the continued viability of Sierra Blanca as the functional equivalent of the border in district court.

This Court has established a tripartite test for determining functional equivalency: "relative performance of the checkpoint; minimal interdiction by the checkpoint of the flow of domestic traffic; and the practical necessity of the substitution of the interior checkpoint for the border in order to monitor international traffic." *United States v. Reyna*, 572 F.2d 515, 517 (5th Cir.), *cert. denied*, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978).

**5.** In attempting "to clarify this grey and nebulous area of Fourth Amendment guarantees," the district court examined over 25 Fifth Circuit opinions and concluded that valid permanent checkpoint searches "are factually limited to searches of large areas within a vehicle where an illegal alien could hide, searches based upon consent, or searches based upon probable cause discovered once the vehicle was validly stopped and its large areas searched." *United States v. Oyarzun*, 582 F.Supp. 121, 122–23 (W.D.Tex. 1984).

therefore think it helpful to examine the development of the law governing warrantless searches at permanent checkpoints that have been determined to be the functional equivalent of the border.

■ ·In general, warrantless searches and seizures are unreasonable under the fourth amendment. An exception to this general rule is the warrantless search at the international border, which is justified on the basis of sovereign self-protection. *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977); *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). Indeed, "[t]he fact that one is in the process of crossing an international boundary provides sufficient reason in itself to permit a search for aliens or contraband, without the presence of any other circumstance that would normally have to attend the requirements of the fourth amendment...." *United States v. McDaniel*, 463 F.2d 129, 132 (5th Cir.1972), *cert. denied*, 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973) (quotation and citations omitted). To justify as border searches routine warrantless searches conducted at points distant from the border, the government must show that the circumstances surrounding the searches make it reasonable to assume that those being searched may have violated the customs or immigration laws. *Id.* at 133.

In *Almeida-Sanchez v. United States*, 413 U.S. 266, 268, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596 (1973), the Supreme Court identified three types of inland traffic-checking operations conducted by the United States Border Patrol in the interest of detecting illegal aliens: (1) permanent checkpoints, (2) temporary checkpoints, and (3) roving patrols.[6] In that case, the Court

held that a roving border patrol stop and search of a vehicle which resulted in the seizure of a large quantity of marijuana without probable cause or consent was unconstitutional under the fourth amendment. In distinguishing the impermissible roving patrol search involved in that case from valid border searches, the Court stated that:

> [S]earches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well. For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

*Id.* at 272, 93 S.Ct. at 2539. Thus the term "functional equivalent of the border" was coined.

Thereafter, in *Hart I*, this Court held that the Sierra Blanca permanent checkpoint is the functional equivalent of the border for searches for illegal aliens. In discussing the functional equivalent aphorism the Court stated: "Long before the Supreme Court coined that phrase in *Almeida-Sanchez*, this Court implicitly treated permanent checkpoints as 'functional equivalents' of the border by upholding the validity of warrantless searches for illegal aliens at such locations." 506 F.2d at 895. The Court expressly declined, however, to consider what kind of "functional equivalent of the border" would justify a thor-

---

**6.** In *United States v. Martinez-Fuerte*, 428 U.S. 543, 552, 96 S.Ct. 3074, 3080, 49 L.Ed.2d 1116 (1976), the Court further elaborated on the three types of inland traffic-checking operations conducted by the United States Border Patrol:

> Permanent checkpoints ... are maintained at or near intersections of important roads leading away from the border. They operate on a coordinated basis designed to avoid circum-

vention by smugglers and others who transport the illegal aliens. Temporary checkpoints, which operate like permanent ones, occasionally are established in other strategic locations. Finally, roving patrols are maintained to supplement the checkpoint system. The statutory authority for all three operations is 8 U.S.C. § 1357(a)(1) & (3).

ough search of a vehicle and its contents for contraband. *Id.*[7]

*United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), established constitutional guidelines for permanent checkpoint stops and searches. The government may stop vehicles for brief questioning of the driver and passengers without individualized suspicion. *Id.* at 562, 96 S.Ct. at 3085. Motorists may then be selectively referred to a secondary checkpoint for further questioning. *Id.,* at 563, 96 S.Ct. at 3085. Further detention is constitutional, however, only if justified by consent or probable cause. *Id.* at 567, 96 S.Ct. at 3087.

Fifth Circuit cases further delineated the scope of a valid search for illegal aliens at a permanent checkpoint that is the functional equivalent of the border. In *United States v. Alvarez-Gonzalez*, 561 F.2d 620, 621 (5th Cir.1977), the Court held that border patrol agents stationed at a functional equivalent of the border need neither a warrant nor probable cause to conduct routine searches of automobile trunks and other large spaces in which aliens may be concealed. *Accord United States v. Robinson*, 567 F.2d 637 (5th Cir.1978). In so holding, the *Alvarez-Gonzalez* Court noted that "[a]lthough in some instances citizens may be subject to a full search for contraband at the functional equivalent of the border, no such intrusion was contemplated at the La Gloria [,Texas] checkpoint." 561 F.2d at 625 (citation omitted). The Court went on to hold that the La Gloria checkpoint was the functional equivalent of the border for purposes of an immigration search. *Id.* at 626.

While this Court has never expressly considered what kind of functional equivalent of the border would justify a thorough search of a vehicle and its contents for contraband, we have applied the border-equivalent principle in cases involving searches for contraband. In the consolidated appeal of *United States v. Luddington* and *United States v. Nelums,* 589 F.2d 236 (5th Cir.), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 666 (1979), this Court upheld a search at the Sierra Blanca checkpoint of the trunk of defendant Nelums' MGB sports car, without speculating as to whether an alien could have been secreted in such a tight space. The inspection that uncovered the contraband (138 pounds of marijuana) occurred after a border patrolman had peered inside the partially open trunk and seen no illegal aliens, but "several packages wrapped in plastic." 589 F.2d at 237. The Court did not disturb the trial court's finding of no probable cause; rather this Court focused on the defendants' argument that Sierra Blanca should no longer retain its legal status as the functional equivalent of the border. The *Luddington* Court justified its holding that Sierra Blanca was the functional equivalent of the border by discussing the proximity of the checkpoint to Mexico, the ease with which persons in Mexico could cross the Rio Grande River and reach the vicinity of Sierra Blanca without passing through any other inspection station, the percentage of domestic traffic interdicted, and the number of illegal aliens discovered through searches at Sierra Blanca. *Id.* at 240–41.

Most recently, in *United States v. Dreyfus-de Campos,* 698 F.2d 227 (5th Cir.),

---

7. The Supreme Court vacated this Court's judgment in *Hart I* for further consideration in light of its intervening decisions in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) and *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). In *Brignoni-Ponce,* the Supreme Court held that a roving patrol stop must be supported by reasonable suspicion that the detained vehicle contains illegal aliens. The *Ortiz* case held that border patrol officers at fixed checkpoints other than those located at the border or its functional equivalent may not search a vehicle

in the absence of probable cause or consent. On remand, this Court held that *Brignoni-Ponce* was not controlling because *Hart* did not involve a roving patrol stop. The Court further held that: "Our decision that the Sierra Blanca checkpoint is the functional equivalent of the border means that the non-probable cause search in this case was a valid border search which met the Fourth Amendment requirement of reasonableness as enunciated in *Almeida-Sanchez* and *Ortiz.*" *Hart II,* 525 F.2d at 1200. Accordingly, the Court reaffirmed its original judgment. *Id.*

*cert. denied,* 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983), this Court upheld a search by border patrol agents at Sierra Blanca of the luggage of a vehicle's occupants in which marijuana and cocaine were found. Following their convictions of conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute, the defendants in *Dreyfus-de Campos* sought appellate review on the grounds that Sierra Blanca should no longer be accorded the status of the functional equivalent of the border and that the evidence was insufficient to sustain their convictions. The court held that the evidence offered by the defendants to support their challenge to the functional equivalency status of the Sierra Blanca checkpoint—the testimony of a transportation engineer and two border patrol officers that the traffic at Sierra Blanca appeared to be largely domestic—was not sufficient to warrant a recharacterization of Sierra Blanca. *Id.* at 229. The Court further held that the evidence was sufficient to sustain the convictions. *Id.* at 229–30. The basis of the Court's holding that the search was a valid border search was not a finding of probable cause, but the reaffirmation of the *Luddington* holding that Sierra Blanca is the functional equivalent of the border. *Id.* at 229.

## III. THE CASE *SUB JUDICE*

 In applying the principles discussed in Part II above, we are constrained to vacate the district court's order suppressing the evidence seized during the searches involved in the instant appeals. In so doing, we are mindful of the historical perspective of the Sierra Blanca checkpoint's status as the functional equivalent of the border for immigration searches. *See Hart I.* We are bound, however, by the precedent of this Circuit which has evolved since *Hart I.* The decisions in *Luddington* and *Dreyfus-de Campos,* the most recent cases in this Circuit originating out of the Sierra Blanca checkpoint, while not expressly turning on considerations of probable cause, reasonable suspicion, or consent, by implication hold that non-proba-

ble cause searches for contraband at Sierra Blanca are valid border searches because of that checkpoint's legal status as the functional equivalent of the border.

In his brief, Browning suggests that our persistent use of the "functional equivalent" of the border" language unnecessarily injects confusion and complexity into the area of border search law and offers to this Court the approach adopted by the Eleventh Circuit in *United States v. Garcia,* 672 F.2d 1349 (11th Cir.1982). The *Garcia* Court stated:

> [W]e decline to follow prior decisions in using the 'functional equivalent' language to refer to Border Patrol or other checkpoint searches. These searches do not fit within the traditional definition of a border search, which refers to searches of persons, conveyances, or objects that have come into the United States from outside. As we have already noted, checkpoint searches do not require that the object of the search have crossed the border. We thus choose to refer to such searches simply as 'checkpoint searches' and not as searches at the 'functional equivalent of the border.' We view the 'functional equivalent of the border' language as peculiarly appropriate to describe those searches that, although not conducted at the actual physical border, take place after a border crossing at the first practicable detention point. Such searches are truly border searches because their sole justification is the fact that the border has been crossed. Because the person, conveyance, or object is searched at the first place where it comes to rest within the country, it can truly be considered as having 'br[ought] the border with it.'

672 F.2d at 1365 (citations omitted). While *Garcia* may provide persuasive authority for Browning's contentions, we note that neither Oyarzun, nor Browning or Jackson challenged Sierra Blanca's status as the functional equivalent of the border in district court. Thus, they may not attack the checkpoint's functional equivalency on appeal. Furthermore, this panel is bound by

this Court's prior decisions in *Luddington* and *Dreyfus-de Campos,* and in the absence of en banc reconsideration of these cases, we must apply their rule.

Accordingly, the orders of the district court granting defendants' motions to suppress are vacated and the cases are remanded for further proceedings consistent with this opinion.

VACATED AND REMANDED

ROBERT MADDEN HILL, Circuit Judge, specially concurring:

While I adhere to Judge Johnson's determination, in ruling on the validity of the searches conducted in these cases, that we are bound by this Court's holdings in *United States v. Luddington,* 589 F.2d 236 (5th Cir.), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 666 (1979), and *United States v. Dreyfus-de Campos,* 698 F.2d 227 (5th Cir.), *cert. denied,* 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983), I nevertheless choose to specially concur because I am greatly concerned about two aspects of this case. First, I question whether the criteria adopted by this Court defining places that are the functional equivalent of a border are in keeping with holdings of the Supreme Court. Second, I question the authority for the quantum leap that has occurred in the recent holdings of this Court that extend the type of search that may be conducted at a checkpoint that is the functional equivalent of a border. In both *Luddington* and *Dreyfus-de Campos,* this Court permitted a contraband search of vehicles at the Sierra Blanca checkpoint without any requirement that the officer have reasonable suspicion or probable cause to believe that contraband was being concealed.

Officials at checkpoints that are judicially deemed the functional equivalent of a border have been granted increasingly intrusive power in connection with the search of vehicles at these checkpoints, without any requirement of probable cause or reasonable suspicion. These include the power to stop and question occupants about aliens, *see United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), to search in automobile cavities that could conceal aliens, *see United States v. Alvarez-Gonzalez,* 561 F.2d 620 (5th Cir.1977) (*Alvarez-Gonzalez II*),[1] and, finally, to freely search automobiles not only for aliens but also for contraband, *see Luddington, supra,* and *Dreyfus-de Campos, supra.* These two latter decisions impliedly hold that searches for contraband at checkpoints that are the functional equivalent of a border need not be preceded by any form of cause or suspicion. I do not believe this latest extension of the right to search is adequately supported either by this Circuit's prior rulings or by the rulings of the Supreme Court.

Because neither *Luddington* nor *Dreyfus-de Campos* expressly addresses whether officers must show some cause in order to conduct a contraband search of an automobile at a checkpoint that is the functional equivalent of a border, it is difficult to ascertain the authority upon which both decisions rely for the implied holding that such searches may proceed without a showing of cause. *Dreyfus-de Campos* relied primarily upon *Luddington,* which in turn relied heavily upon *Alvarez-Gonzalez II, supra,* a case in which this Court stated, "in some instances citizens may be subject to a full search for contraband at the functional equivalent of the border...." 561 F.2d at 625 (citing *United States v. Brennan,* 538 F.2d 711, 714–15 (5th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977)).[2] *Brennan* thus is

---

**1.** Alvarez-Gonzalez II was preceded by *United States v. Alvarez-Gonzalez,* 542 F.2d 226 (5th Cir.1976) (*Alvarez-Gonzalez I*).

**2.** In *Alvarez-Gonzalez II, supra,* we quoted the district court's description of the checkpoint procedures: "When a search for aliens is determined to be justified, only compartments large enough to conceal a body are scrutinized; a search of most such cavities takes less than a minute." We then went on to state that, "it is just 'searches of this kind' that the Supreme Court in *Almeida-Sanchez* [*v. United States*] contemplated might be made at functional equivalents of the border. 413 U.S. [266] at 272, 93 S.Ct. 2535 [at 2539, 37 L.Ed.2d 596]." *Alva-*

the sole support for the language appearing in *Alvarez-Gonzalez II.*

In *Brennan* we held that an airport at which a search of an airplane occurred was not the functional equivalent of a border; accordingly, this Court's assertion in that case that "agents [at the functional equivalent of a border] were entitled to conduct a full search for contraband without particularized knowledge of what Brennan or his plane was carrying ...", was dictum. *Brennan,* 538 F.2d at 714–15. In *Brennan,* we also summarized the conditions for entry into this country by stating that "[t]he national interests in self-protection and protection of tariff revenues authorize a requirement that persons crossing the border identify themselves and their belongings as entitled to enter and be subject to search." *Id.* at 715.

The above language in *Brennan* paraphrases language in *Almeida-Sanchez* which describes the permissible intrusiveness of a regular border search. In coining the phrase "functional equivalent of a border," the Supreme Court in *Almeida-Sanchez* stated that:

> [w]hatever the permissible scope of intrusiveness of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well. For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

413 U.S. at 272, 93 S.Ct. at 2539 (footnote omitted). Thus, the Court held that a search similar to those permissibly conducted at the national border might be conducted at two particular places within the United States—at the confluence of two roads extending from the border and at an airport when an international flight has landed. Notwithstanding the foregoing holding, I am not convinced that at the Sierra Blanca checkpoint the Supreme Court would allow searches similar to those routinely conducted at the border merely because this Court, pursuant to our own criteria, *see Alvarez-Gonzalez I, infra,* has characterized Sierra Blanca as the functional equivalent of a border.

First, in *Almeida-Sanchez* the Supreme Court was dealing with a search by a roving border patrol for illegal aliens; consequently, the quoted language above describing what constitutes the functional equivalent of a border was not required for the holding and thus was mere dictum. It is unclear, therefore, whether the dictum enunciated in *Almeida-Sanchez* would be controlling today. Second, and just as important, the Supreme Court has yet to directly address whether a contraband search at the functional equivalent of a border would be permissible without any showing of cause.

The factors that determine just what constitutes the functional equivalent of a border have been formulated and molded by lower courts since 1973 when the Supreme Court decided *Almeida-Sanchez.* In *Almeida-Sanchez,* the Court described what it considered to be places that would constitute the functional equivalent of a border. One place, quite understandably, is the point of first arrival of an airplane entering this country. Another place, much more difficult to define, is the "point [near the border] marking the confluence of two or more roads that extend from the border ..." 413 U.S. at 273, 93 S.Ct. at 2539. The Court did not, however, attempt a comprehensive formulation of "functional equivalence."

Interpreting and expanding the Supreme Court's illustration of functional equivalence, this Court isolated three major con-

---

*rez-Gonzalez II,* 561 F.2d at 625 n. 9. The language from *Alvarez-Gonzalez II,* quoted in the text, is dictum because it involved a sufficiently

large automobile cavity search and not a contraband search.

siderations in determining whether an interior checkpoint is the functional equivalent of a border. *Alvarez-Gonzalez I, supra.* They are the "relative permanence of the checkpoint; relatively minimal interdiction by it on domestic traffic; and the checkpoint's capability to monitor portions of international traffic not otherwise controllable." *Alvarez-Gonzalez II,* 561 F.2d at 621–22 (citing *Alvarez-Gonzalez I,* 542 F.2d 226 (5th Cir.1976)). Merely because this Court has determined that Sierra Blanca fulfills the criteria we established to identify the functional equivalent of a border, I am not convinced nor is it altogether clear that the Supreme Court's holding and the language in *Almeida-Sanchez* goes so far as to provide authority for contraband searches without any cause, i.e., like those routinely conducted at the border.

As Judge Goldberg's insightful dissent in *Alvarez-Gonzalez II,* 561 F.2d at 626, makes clear, the majority's holding that the

La Gloria checkpoint, involved in that case, is the functional equivalent of a border resulted from its rather liberal construction of the permissible percentage of domestic traffic flowing through the checkpoint that would allow a status of functional equivalence.[3] Thus, the majority's holding and reasoning in *Alvarez-Gonzalez II* tended to expand the concept of functional equivalency as adumbrated by the Supreme Court fourteen years earlier in *Almeida-Sanchez.*

Given the subtle expansion by this Court of the Supreme Court's original concept of the functional equivalent of a border, illustrated in one instance as "a point [near the border] marking the confluence of two or more roads that extend from the border ...," 413 U.S. at 273, 93 S.Ct. at 2539, it is highly problematic whether the Supreme Court today would grant officials manning such checkpoints, of which Sierra Blanca is one,[4] "unbridled discretion to search any

---

3. The dissent in *Alvarez-Gonzalez II* questioned the majority's determination that 40% of the northbound La Gloria traffic was domestic while 60% was international and thus that "international traffic clearly predominates at the checkpoint." 561 F.2d at 623. While the dissent questions the facts behind such a determination, I find it significant that the majority refers to the fact that there was not an interdiction of anything approaching a *majority percentage* of domestic traffic; a majority percentage of international traffic is a much less demanding consideration in determining functional equivalence than the second of the three considerations set out in *Alvarez-Gonzalez I,* i.e., "*relatively minimal* interdiction of domestic traffic." 542 F.2d at 229. (emphasis added).

4. As Judge Johnson's opinion makes clear, "neither of the defendant's in this consolidated appeal contested the continued viability of Sierra Blanca as the functional equivalent of a border," Opinion 6 at n. 4; nevertheless, I do not feel constrained to set forth my doubts concerning the status of the Sierra Blanca checkpoint. The last opportunity to exhaustively evaluate the status of the Sierra Blanca checkpoint arose over six years ago in *Luddington, supra.* (In *Dreyfus-de Campos,* decided two years ago, this Court merely concluded that the paucity of statistics offered by the party challenging the functional equivalent status of Sierra Blanca did not warrant a recharacterization of the checkpoint). In *Luddington* we reaffirmed the original determination in *United States v. Hart,* 506 F.2d 887 (5th Cir.) *vacated and remanded,* 422 U.S. 1503, 95 S.Ct. 2674, 45 L.Ed.2d 706 (1975), *reaff'd on*

*remand,* 525 F.2d 1199 (5th Cir.), *cert. denied,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976), that Sierra Blanca was the functional equivalent of a border. We then addressed the second of the three considerations of *Alvarez-Gonzalez I,* which was not addressed in *Hart*: minimal interdiction by the checkpoint of the flow of domestic traffic, and determined that this consideration also warranted finding Sierra Blanca to be the functional equivalent of a border. My concern lies with this determination.

While no one can be sure of the exact change in the flow of international and domestic traffic patterns over the past six years, I note that the *Luddington* Court found that the district court's conclusions favoring maintenance of the checkpoint as a functional equivalent, were not the result of "firm statistical data" but rather were the product of "logical inferences drawn from the record." *Luddington,* 589 F.2d at 241. In addition, the Court noted that while 2.7 million people pass eastward through the checkpoint, over "2 million persons per *month* cross the border from Mexico in the El Paso sector at established Ports of Entry." *Id.* The inference given these numbers and given the manner in which Interstate 10 parallels the Rio Grande River, that the checkpoint monitors predominately international traffic is not necessarily a logical one. Border crossings in the El Paso sector, for many, are merely short excursions and do not necessarily entail a lengthy trip eastward on Interstate 10. Moreover, the Court's reference to the additional amount of illegal border crossings that are unaccounted

person and any vehicle for contraband without any of the constraints normally imposed upon federal officers by this Country's Constitution." *United States v. Oyarzun,* 582 F.Supp. 121, 123 (W.D.Tex. 1984).

Nevertheless, we are bound, to my discomfort and I am sure to that as well of the able district judge below, by the prior holdings of this Court in *Luddington* and in *Dreyfus-de Campos* to reach the conclusion we do today in these cases that the searches conducted did not suffer from any constitutional infirmity.

for can not and should not lend support for a statistically-based determination. Finally, the demographic shift in population to the Southwest in the past six years leads me to seriously question whether Sierra Blanca should still be accorded the status of the functional equivalent of a border.