UNITED STATES of America

v.

Anthony Wayne BROWNING and Charles Jackson.

No. P-84-CR-15.

United States District Court, W.D. Texas, Pecos Division.

April 15, 1986.

1102

James Blankenship, Asst. U.S. Atty., Midland, Tex., for plaintiff.

Roddy Harrison, Pecos, Tex., Robert Ramos, El Paso, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

BUNTON, District Judge.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. Const., Amend. IV.

The Fourth Amendment of the United States Constitution was written to protect Americans from government tyranny. The basis for this constitutional aspiration was recognized by Supreme Court Justice Brandeis in *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928).

The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual na-

ture, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be left alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment.

It is with this thought in mind that the Court now focuses its attention on the matter at hand.

Before the Court is the Defendants' motion to suppress evidence. The Defendants are challenging the status of the Sierra Blanca Checkpoint as a "functional equivalent of the Border."

After considering the evidence presented, and after a review of the controlling legal authorities, the Court's opinion is as follows:

## I.

### *Factual Background*

On March 31, 1984, CHARLES JACKSON and ANTHONY WAYNE BROWNING drove up to the Sierra Blanca Checkpoint in a 1984 Chrysler LeBaron bearing California license plates. Defendant JACKSON was the driver of the automobile and Defendant BROWNING was in the passenger seat. While Border Patrol Agents were questioning JACKSON and BROWNING about their citizenship, Agent Fogt observed cigarette rolling papers and a glass pipe on the rear floorboard of the vehicle. At this point, Agent Fogt directed JACKSON to open the trunk, whereupon the agent found a cosmetic case containing 24 bottles marked "Preludin", with 100 pills in each bottle. The agents also discovered a small amount of marijuana residue in the back seat of the car and a paper bag containing cotton balls and a metal scrub pad underneath the front seat.

Based upon the evidence discovered, JACKSON and BROWNING were indicted by a Federal Grand Jury on April 18, 1984, with conspiracy to possess Preludin, a controlled substance, with intent to distribute and with possession with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 846.

Both Defendants moved to suppress the evidence seized from the automobile. On March 5, 1984, this Court granted the Defendants' motion to suppress the evidence seized by the government. *United States v. Oyarzun,* 582 F.Supp. 121 (W.D.Tx. 1984). The United States appealed the District Court decision and the Fifth Circuit reversed and remanded the case for trial. *United States v. Oyarzun,* 760 F.2d 570 (5th Cir.1985).

On remand, the Defendants filed a second motion to suppress in which the status of the Sierra Blanca Checkpoint as a "functional equivalent of the border" was challenged. The Defendants also requested that a traffic survey be conducted at the checkpoint by the Border Patrol. This Court entered an order requiring the United States Border Patrol to conduct a survey of all traffic passing through the checkpoint for a period of two weeks, 24 hours a day. The Fifth Circuit vacated that order in a Writ of Mandamus issued on October 21, 1985 (#85–1604, unpublished).

On November 20, the Defendants filed a second motion for authority to conduct a traffic survey at the Sierra Blanca Checkpoint by members of the Federal Public Defender's staff. This Court granted the Defendants' motion. The government then sought a second Writ of Mandamus to enforce the Circuit's prior Mandate. The Fifth Circuit denied the government's request and entered an order setting forth the restrictions under which the Public Defender could conduct a survey.

The survey was specifically limited to inquiry of the drivers of the vehicles that were stopped by the Border Patrol Agents

manning the checkpoint. The Federal Public Defender's inquiry of drivers was limited by the Fifth Circuit to two questions:

1. The driver could be asked to state the point of origin of his present trip; then, and only if the answer to that question indicated that the point of origin was outside the United States, the surveyor was permitted to ask a follow-up question;

2. Whether the traveler had already been stopped and inspected or questioned at a point of entry into this country or at some other checkpoint.

Pursuant to the order of this Court dated November 25, 1985, and as modified by orders of the Fifth Circuit dated December 6 and December 30, 1985, the staff of the Federal Public Defender for the Western District of Texas conducted a 24-hour a day, week long survey during January 8–15, 1986, at the Sierra Blanca Checkpoint. The purpose of the survey was to investigate the possibility that the circumstances at the Sierra Blanca Checkpoint have changed to the point that the checkpoint could no longer be the "functional equivalent of the border."

## II.

It is without doubt that the UNITED STATES has the authority to look after and protect its borders. This power can be effectuated by routine inspections and searches of individuals or conveyances seeking to cross our borders.

This power was recognized by the United States Supreme Court in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925):

Travelers may be so stopped in crossing an international boundary, because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

*Id.* at 154, 45 S.Ct. at 285.

■ The United States Supreme Court, citing the dictum from the Carrol case, stated in *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596, (1973), that such searches in certain circumstances may take place not only at the border itself, but at its functional equivalents as well. This case marked the first time that the Supreme Court used the term "functional equivalent of the border." It should be noted that the discussion in *Almeida-Sanchez* vis a vis the "functional equivalent of the border" was obiter dictum. Furthermore, the Supreme Court's definition of the term "functional equivalent" was not very clear. The Court stated:

For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be the functional equivalent of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

*Id.* at 273, 93 S.Ct. at 2539.

The only clear guidance that the Supreme Court's definition provides is that travelers coming into the United States from a foreign country, may be inspected at their original point of entry into this country, no matter where that point of entry may be. As to the first example given, the Court's meaning is quite unclear. In addition, the Court itself was unsure whether such a location would qualify as a functional equivalent of the border. They said such location "might be a functional equivalent." This clearly is in contrast to their second example which they state "would clearly be a functional equivalent of the border."

The Fifth Circuit sought to shed light on the Supreme Court's examples in a thorough and well reasoned opinion in *United States v. Brennan*, 538 F.2d 711 (5th Cir. 1976). The Court stated;

> In the first example there inheres a high degree of probability that a border crossing took place and an attendant likelihood that nothing about the object of the search has changed since the crossing ... In the case of the airport search of the nonstop flight, both assumptions become certainties. *Id.* at 715.

At about the same time, the Fifth Circuit also stated that "the functional equivalency label is one not lightly to be bestowed." *United States v. Calvillo*, 537 F.2d 158 (5th Cir.1976).

The Fifth Circuit first addressed the issue of whether the Sierra Blanca Checkpoint was a functional equivalent of the border in *United States v. Hart*, 506 F.2d 887 (5th Cir.1975), vacated and remanded, 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 (1975), 525 F.2d 1199 (5th Cir.1976) (on remand). In *Hart, I*, the Court determined that the Sierra Blanca Checkpoint was a "functional equivalent." However, the Court said that the checkpoint was a "functional equivalent" for § 1357 searches for aliens. The Court's decision did not say whether a traditional border search could occur at the checkpoint. In fact, the Court implies that there are different types of functional equivalents of the border, with correspondingly different permissible search guidelines. The Court stated:

> Of course, at an international boundary, the search is not restricted to a § 1357 search for aliens but may be a complete, thorough search of the vehicle and its contents for contraband and anything else for which illegal entry may be sought. We need not consider here what kind of a 'functional equivalent of the border' would permit such a search.
>
> . . . . .
>
> We do not purport to decide here any more than the case at hand involving a § 1357 search for aliens at the Sierra Blanca permanent checkpoint. In so lim-

iting our decision, we reject the idea that every vehicle must be shown to be legally stopped at the Sierra Blanca Checkpoint, however important that element might be to the kind of thorough search that can be made at an international boundary. 506 F.2d 887 at 895.

Thus, the Fifth Circuit strongly implied that if a full blown border search were to occur at the Sierra Blanca Checkpoint, a showing must be made that the vehicle recently crossed the border or, in other words, be involved in international travel.

█ Since the *Hart* decisions in 1975 and 1976, a specific tripartite test of essential factors that must exist for a border patrol checkpoint to be considered a functional equivalent of the border has evolved. The *Hart* factors were narrowed to a three-part test in *United States v. Alvarez-Gonzalez*, 542 F.2d 226 (5th Cir.1976). 561 F.2d 620 (5th Cir.1977).

As in the previous *Hart* decisions, the Court explicitly stated they were determining "functional equivalence of the border" only for immigration type search purposes. The first factor laid down was that the Court is to consider the character of the checkpoint. The checkpoint is to function like a permanent border checkpoint, and not like the roving patrol which was condemned in *Almeida-Sanchez*. In other words, the relative permanence of the checkpoint is to be considered.

The second factor, and indeed the most important factor, is the ratio between international and domestic traffic passing through the checkpoint in question. The Ninth Circuit has gone so far as to say that this ratio is the dispositive factor in whether a checkpoint is a functional equivalent of the border.

> If a search takes place at a location where virtually everyone searched has just come from the other side of the border, the search is a functional equivalent of a border search. In contrast, if a search takes place at a location where a significant number of those stopped are domestic travelers going from one point

to another within the United States, the search is not the functional equivalent of a border search. *United States v. Bowen*, 500 F.2d 960, 965 (9th Cir.1974), aff'd, 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975).

The Fifth Circuit did not go this far, but they strongly emphasized the significance of this consideration, "No checkpoint which occasions, day in and day out, the interdiction of anything approaching a majority percentage of domestic traffic can properly be seen as approximating the border. *Alvarez-Gonzalez I*, 542 F.2d 226 (5th Cir. 1976). The Fifth Circuit in a later decision said that "the major factor necessary to an affirmative determination of functional equivalence" is the minimal interdiction of domestic traffic. *United States v. Reyna*, 572 F.2d 515, 517 (5th Cir.1978) (on remand).

The third factor to be considered is "the degree to which, as to international traffic, the checkpoint under consideration actually approximates the effect of one physically located at the border." *Alvarez-Gonzalez I*, 542 F.2d 226 (5th Cir.1976). Basically, this factor points to the tactical necessity for the checkpoint.

To this point, it should be noted that international traffic was defined as traffic originating from outside the United States.

The functional equivalency of the Sierra Blanca Checkpoint was upheld again in *United States v. Luddington*, 589 F.2d 236 (5th Cir.1979) and *United States v. Dreyfus-de Campos*, 698 F.2d 227 (5th Cir.1983). In the *Luddington* decision, the Court once again stated that the purpose of the Sierra Blanca Checkpoint is to detect and apprehend aliens who have entered the United States illegally. The defendants in *Luddington* were seeking to challenge the "functional equivalence of the border" status of the Sierra Blanca Checkpoint based on the degree of interdiction of domestic traffic. The Court stated that "although firm statistical data was lacking, the conclusions of the district court are logical inferences drawn from the record." *Luddington* at 241.

In *Dreyfus-de Campos*, again the defendants challenged the status of the Sierra Blanca Checkpoint based on prong two of the *Alvarez-Gonzalez* test. The Court rejected the defendants' arguments "because their opinions are unsupported by factual data, and, further, because they are based upon the perceived number of foreign versus domestic license plates—a distinction irrelevant to the definition of 'international' traffic." *Dreyfus-de Campos*, at 229. The Court went on to say that unless facts relating to the tripartite tests have changed, the Sierra Blanca Checkpoint will keep its functional equivalency designation.

### III.

The Defendants in the matter presently before the Court claim that they have new information concerning the Sierra Blanca Checkpoint. This new information is the focus of the Court's inquiry today. The Court is going to apply the *Alvarez-Gonzalez* tripartite test using the new information that is before the Court.

As concerning the first prong of the *Alvarez-Gonzalez* test, the following facts are pertinent.

The Sierra Blanca Checkpoint is located approximately 80 miles southeast of El Paso, Texas, and four miles west of Sierra Blanca, Texas, on Interstate Highway 10. Leaving El Paso, IH–10 parallels the United States-Mexico border, in a southeasterly direction for approximately 60 miles, coming within 200 yards of the border itself in El Paso (Ex. 102B) and within a mile of the border in many other places.

The checkpoint itself is situated approximately 20 land miles and 14 air miles from the United States-Mexico border. It is manned by United States Border Patrol officers 24 hours a day, 365 days a year, as manpower and weather conditions permit. The primary purpose of this checkpoint is to detect and apprehend aliens who have entered the United States illegally. The checkpoint also operates to detect narcotics and other contraband that have illegally entered the United States.

The checkpoint is strategically located as IH–10 is the only paved road leading from the border in this area, passing through the Quitman Mountains which form a natural funnel for traffic into the checkpoint.

All vehicles traveling east on IH–10 pass through the checkpoint when it is in operation. The officials stop virtually all cars and many of the trucks to make a very brief citizenship inquiry of the occupants. In practice, many commercial trucks and known local vehicles are waved through.

The checkpoint is permanent in nature. Approximately one mile west of the checkpoint on IH–10 there is a sign which reads "inspection Station, all vehicles exist one mile." Somewhat closer to the checkpoint, a second sign reads "Form One Lane Right." The third sign states "Inspection Station all vehicles right lane." When the checkpoint is open, orange traffic cones are positioned on the highway to direct all traffic onto the paved access road to the checkpoint itself. The Border Patrol maintains an office in a trailer at the checkpoint where there are also three stop signs—two with flashing red lights.

Thus, with respect to the relative permanence of the checkpoint, the Court's opinion is that the Sierra Blanca Checkpoint satisfies this requirement.

The second prong of the *Alvarez-Gonzalez* test was the subject of the survey conducted by the Federal Public Defender. In addition to the restrictions mandated by the Fifth Circuit that were mentioned earlier, the following rule was also to be followed:

If a vehicle was referred to the secondary checkpoint, and if an arrest took place, no questions were permitted. The participants in the survey could not impede the duties of the officer.

The following numbers are the raw data that were accumulated by the survey:

| | |
|---|---|
| Total number of vehicles through the checkpoint—January 8–15, 1986 ... | 21,481 |
| Trucks (domestic long haul semi-trucks) ...................... | 17,471 |
| Cars (includes light trucks and recreational vehicles) ............. | 4,010 |

| | |
|---|---|
| Buses ............................ | 55 |
| Bicycles ........................... | 1 |

Vehicles waved through checkpoint by Border Patrol Agents:

| | |
|---|---|
| Trucks ............................ | 12,344 |
| Cars ............................... | 2,834 |
| Total waved through ............... | 15,178 |
| Total inspected for origin of trip ..... | 6,303 |
| No response ....................... | 63 |
| Vehicles originating outside the United States .................... | 317 |
| Previously inspected ............... | 302 |
| Not previously inspected ............ | 9 |
| Unknown (unable to quantify) ....... | 6 |

From this data, the Court has figured the percentage of traffic that was domestic vis a vis the percentage that was international. To arrive at these figures, the Court divided the number of vehicles that originated outside the United States into the total number of vehicles that went through the checkpoint. The 63 vehicles from which a response was not derived were not included in the total number of vehicles.

| | |
|---|---|
| Percentage of domestic traffic ...... | 98.52% |
| Percentage of international traffic ... | 1.48% |

If the Court were to use only those cars which were inspected in its computation of domestic/international traffic, then 94.92% of the traffic is domestic and 5.080% is international. Again the 63 vehicles from whom no response was derived were not used in the total number of vehicles which were inspected for point of origin.

The Court believes that the percentage derived from the total number of vehicles which went through the checkpoint is the figure that should be used. The reason for this is that by waving a car through, the Border Patrol Agents are making a determination about the vehicles's origin.

Of the traffic that was international, 95.26% of those vehicles were previously inspected at a United States Customs Station. When the number of vehicles that hadn't been inspected is compared to the total, it is clear that 99.93% of the vehicles going through the checkpoint were previously inspected by the United States Customs Service, or were not required to go through inspection at all. In arriving at

these figures, the vehicles which were not previously inspected were lumped with those in which a determination as to this fact could not be made.

From the data presented it is clear to this Court that the traffic on Interstate 10 traveling East is overwhelmingly domestic. For this reason, the Sierra Blanca Checkpoint does not satisfy prong two of the *Alvarez-Gonzalez* test.

As to the last prong of the *Alvarez-Gonzalez* test, the government has presented evidence demonstrating that the Sierra Blanca Checkpoint is very useful in the apprehension of illegal aliens. From this standpoint, it is clear that the Sierra Blanca Checkpoint satisfies prong three of the "functional equivalent of the border" test that has been laid down by the Fifth Circuit.

■ After weighing the factors, the Court's opinion is that the Sierra Blanca Checkpoint is not the "functional equivalent of the border." The Court can reach no other conclusion as the evidence overwhelmingly demonstrates that the traffic passing through the checkpoint is virtually all domestic traffic. In reaching this decision, the Court is cognizant of the historical right of a sovereign to protect itself by stopping and examining persons and property crossing into its borders. However, the Court does not believe that the status of "functional equivalent of the border" should be lightly bestowed, and the Court does not believe that this status should be used merely to circumvent Fourth Amendment rights.

To this end, the Court is in accord with Judge Goldberg, Circuit Judge for the Fifth Circuit, who stated:

Rather than a device for circumventing Fourth Amendment restraints on searches of those who have not recently entered the country, the functional equivalency concept is one designed merely to allow searches of international travelers at interior points that, when compared to the border itself, are more convenient (because, for example, located at the confluence of two highways, eliminating the

need for a border checkpoint on each) or more effective (because, for example, those traveling inward would more likely pass through such a station than through one located on the border itself). In practical operation, any highway checkpoint removed from the border will interdict some domestic travelers, and I certainly do not suggest that that fact prevents the point from achieving border status or casts any doubt on the authority to search such travelers at those locations. I do insist, however, that a checkpoint must achieve the functional equivalency label on the basis of its capacity to intercept international travelers, nor on the basis of its ability to stop intra-national travelers, however useful such stops might prove in controlling border violations.

*United States v. Alvarez-Gonzalez,* 561 F.2d 620 (1977).

■ The Border Patrol asserts that the Public Defender's survey should be given little, if any, legal validity. They claim that by having asked only the question "What is the point of origin of your trip?", the survey failed to take into account the true nature of what "international traffic" constitutes. The Border Patrol claims that "international traffic" includes traffic originating close to the border but on the American side. For authority, the Border Patrol cites *Luddington,* 589 F.2d at 241, and *Dreyfus-DeCampos,* 698 F.2d at 229.

The Border Patrol goes on to say that El Paso and the area east of it to the checkpoint should be included in a definition of the border, and at the very least, that any traffic which has stopped in El Paso, or on I–10 from El Paso to the checkpoint qualifies as "international traffic."

The Court finds this to be absurd. The Court cannot fathom the idea that one becomes part of international traffic simply by traveling through El Paso.

As to the government's contention that the question asked by the Federal Public Defender in its survey doesn't meet muster in regard to the definition of "international

traffic," the Court believes that this argument is wrong on several accounts.

Firstly, the questions being asked by the Federal Public Defender were the very questions the Fifth Circuit ordered that they ask.

Secondly, a careful reading of the cases which set forth the requirements of the Fifth Circuit for a checkpoint to be a "functional equivalent of the border," all state that the Court was determining functional equivalency for the purpose of immigration searches. The case at hand did not involve an immigration search. It was a search for drugs. The search conducted in this case was more akin to the type of search that is traditionally only allowed at the border. The Fifth Circuit has never expressly stated what criteria must necessarily be present before a full blown border type search is allowable at a "functional equivalent of the border." The Fifth Circuit stated, "A more serious interference of this sort could well result in the striking of a different balance in determining a checkpoint's status as the functional equivalent of the border, since the degree of intrusion clearly bears on that status." *Alvarez-Gonzalez II* at 625. Thus, because the search conducted in this case was not an immigration search, the Court need not follow the definition of "international traffic" as used in cases involving immigration searches at the "functional equivalent of the border."

This Court does not believe that the criteria adopted by the Fifth Circuit in defining places that are the "functional equivalent of the border" are in keeping with the holdings of the Supreme Court. It is egregiously incorrect to say that any traffic passing through El Paso is "international traffic." Therefore, the question about the origin of a vehicle's trip, as used by the Federal Public Defender is perfectly valid, and as such the survey conducted by the Public Defender is legally valid.

To allow the checkpoint to keep its "functional equivalent of the border" status would clearly be unconstitutional based on the evidence presented. "Functional equiv-

alency" should not be used as a guise to get around Fourth Amendment rights.

The Court is not trying to close down the Sierra Blanca Checkpoint. The Court recognizes that the Sierra Blanca Checkpoint is very useful in the apprehension of illegal smugglers. However, just because the checkpoint is useful for law enforcement purposes is no reason for the checkpoint to keep its "functional equivalent of the border" status.

The Court's eyes are not clouded by the fact that the Sierra Blanca Checkpoint is a very useful law enforcement tool. As the late Supreme Court Justice Brandeis so eloquently stated:

And it is also immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding ...

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

*Olmstead,* 277 U.S. at 479 and 485, 48 S.Ct. at 572 and 575.

 Absent "functional equivalent of the border" status, the checkpoint will continue to serve as a very useful law enforcement tool. The Sierra Blanca Checkpoint can continue to stop vehicles as it has in the past, even if there is no reason to believe the particular vehicle contains illegal aliens. *United States v. Ortiz*, 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975).

As such a Border Patrol agent, who is conducting routine immigration checks of motorists passing through a permanent Border Patrol checkpoint may validly stop any vehicle for any reason. That Border Patrol agent may then ask the vehicle's occupants their respective national citizenship and determine their legal status within this Country. That same Border Patrol agent may then request the vehicle to proceed to the permanent checkpoint's secondary inspection area. The vehicle may then be searched for illegal aliens hidden in the vehicle. The scope of such search, however, is limited to the large areas of the vehicle where an illegal alien could reasonably be hidden. For any of these actions, the Border Patrol agent need not have probable cause, nor need he have a reasonable suspicion based upon articuable facts. The Border Patrol agent is only limited in his actions by the normal constitutional constraints of reason.

However, to proceed further in searching the vehicle, the Border Patrol agent must have either probable cause to search the vehicle, a valid search warrant, or the consent of the vehicle's occupants.

### IV.

 Although the Court has determined that the Sierra Blanca Checkpoint no longer can enjoy "functional equivalent of the border" status, the Court must deny the Defendants' Motion to Suppress. The findings presented to this Court in the Public Defender's survey do not have any bearing on what the checkpoint's status was in 1984 when the Defendants were arrested. Furthermore, the evidence presented to show that the checkpoint's situation in 1984 was the same as when the survey was taken failed to prove that the circumstances were the same. Thus, the Defendants' Motion to Suppress Evidence is hereby DENIED.